# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

PAUL NATHAN HENDERSON,
Defendant and Appellant.

S098318

Riverside County Superior Court
INF027515

July 30, 2020

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Liu, Cuéllar, Kruger, and Groban concurred.

PEOPLE v. HENDERSON

S098318


Opinion of the Court by Corrigan, J.


Defendant Paul Nathan Henderson was convicted of the first degree murder of Reginald Baker, with special circumstances of commission during a robbery and burglary and an enhancement for personal use of a deadly weapon. He was also convicted of attempted deliberate and premeditated murder of Peggy Baker, assault with force likely to produce great bodily injury, first degree robbery, first degree burglary, and other related offenses.[1] Defendant separately admitted several prior convictions.[2] The jury returned a verdict of death, and the court imposed that sentence along with a separate term of life with the possibility of parole for the attempted murder and a determinate term of 15 years on the remaining counts and enhancements. This appeal is automatic.

We conclude that defendant's statements were improperly admitted in light of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*). Reasonable doubt exists whether the jury would

---

[1]     Penal Code sections 187, 190.2, subdivision (a)(17)(A) and (G), 12022, subdivision (b), 187, 664, 245, subdivision (a)(1), 211, 459; Vehicle Code section 10851, subdivision (a).

All subsequent undesignated statutory references are to the Penal Code. To avoid potential confusion, we refer to the Bakers by their first names.

[2]     Sections 667, subdivisions (c) and (e), 1170.12, subdivision (c), 667.5, subdivisions (a) and (b).

1

have found him guilty had his statements been excluded. Accordingly, we reverse the judgment in its entirety and remand the case for further proceedings.

# I. BACKGROUND

## A. *Guilt Phase*

### 1. *Prosecution*

Viewed in the light most favorable to the judgment, the evidence presented at trial, including defendant's statements, was as follows.

#### a. *The Charged Crimes*

Late in the evening on June 22, 1997, 71-year-old Reginald and his wife Peggy were watching television in their Cathedral City mobile home. Defendant entered and said, " 'Don't yell or scream and no one will get hurt.' " He held a knife to Reginald's throat, demanded the car keys, and bound the victims. Peggy pleaded that he remove Reginald's gag, fearing he would be unable to breathe and suffer a heart attack. Defendant refused and ordered Peggy to put a gag in her mouth.

Defendant took the victims' "bingo money" from a can on the dresser, looked through Peggy's costume jewelry, and asked if they had any guns. Peggy said that they did not and asked: " 'Why are you doing this? We don't have anything.' " Defendant left Reginald kneeling on the floor and moved Peggy into the bathroom. He rummaged around the home, went out to the victims' car, then returned. Peggy asked to leave the bathroom to check on her husband. Defendant put his arm around her neck in a "strangle hold" and covered her nose with his hand. When Peggy struggled to break free, defendant "tried to crack" her neck. He struck her on the head, knocking her to the ground. Peggy lay still; when defendant lifted her arm, she let

it hang limply. He covered Peggy with a sheet and left in the Bakers' car, a maroon 1992 Chevrolet.

Peggy went to Reginald, who appeared dead. Unable to call 911 because defendant had disabled the telephone wires, Peggy went to the home of neighbor Morton Schuman. She was so badly injured that Schuman did not recognize the "grotesque figure" in front of him. Peggy was treated for a broken nose and multiple facial contusions.

Responding officers found Reginald's body in the ransacked residence. There were two steak knives in the bedroom. Reginald's neck bore a four-inch cut about one-third of an inch deep. The wound did not sever any major veins or arteries. An autopsy revealed that Reginald's severe heart disease, exacerbated by the stress of the attack, resulted in cardiac arrest.

### b. *Events Leading to Defendant's Arrest*

Just after midnight on the night of the murder, Latesha Wasson and Dana Flowers were sitting in a car in Indio when defendant pulled up alongside them driving a large "burgundy" car. Defendant said the car belonged to a woman who employed his mother. Around 9:00 the next morning, a deputy sheriff patrolling in Desert Hot Springs spotted an African-American man driving a maroon Chevrolet similar to the Bakers' stolen car. The driver sped up, turned a corner, and spun out, hitting a street sign. The deputy approached with his gun drawn, but the driver fled on foot. The deputy was unable to identify the driver from a photographic lineup containing defendant's picture. The abandoned car belonged to the Bakers.

Later that afternoon defendant appeared at the house of Tamara Elam and Michael White. While defendant waited for

White to come home, he and Elam watched a news report about a local police chase. Defendant admitted he was involved in the incident.

In late June 1997, Gregory Clayton and defendant met at a homeless center in Los Angeles. Clayton testified that defendant said several times he had killed someone. He admitted entering a trailer home, cutting a man's throat, beating his wife, and taking the victims' maroon Chevrolet. But, according to Clayton, defendant also said that two trained killers committed the crimes while he waited outside. Clayton, who had been a police informant in the past, reported defendant's admissions, describing him and giving his name as "Caylin Hawk." Police told Clayton the description he gave did not fit the person wanted for the crimes. Clayton tried to get more details from defendant and then contacted the FBI, Crime Stoppers, a radio station, and a television outlet. He inquired about the facts of the crimes, the description of the perpetrator, and whether there was a reward. After defendant's arrest, Clayton received a $1,000 reward.

No fingerprint or biological evidence connected defendant to the murder scene or stolen car.

### c. Defendant's Statements to Police

Defendant ultimately admitted the Baker crimes. He initially claimed that he had used drugs that night and could not remember what happened. He recalled seeing Reginald's bloodied body and Peggy lying on the floor. He admitted that he was the only one at the house.

He eventually gave more details. He had jumped a fence into the trailer park and tried to steal a car, but could not start

it.[3]  He saw the Bakers watching television, entered the home, and said he was there to rob them.  Peggy cried and said her husband had a heart condition.

He ordered both victims into the bedroom and bound them.  Defendant took a small amount of money and tried to steal the television, but it was too heavy.  It appeared to him that Reginald was having a heart attack.  Finding that Reginald was not breathing, he covered him with a sheet.  He did not remember cutting Reginald's throat.  Defendant saw blood on Peggy's face but could not remember beating her.  He did recall seeing blood on his own gloved hands.  Peggy appeared to be dead, so he covered her with a sheet and fled in their car.

Defendant could not explain why he had harmed the victims and insisted that it was not like him to be violent.  He expressed remorse and confirmed that he acted alone.

### d.  Peggy's Description of Her Assailant

During the assault Peggy got a clear look at the attacker's face.  That night, Peggy told an officer that he had very pale, light skin, no facial hair, and no glasses.  The next morning she wrote the following description:  Black male, in his twenties, around five feet 10 inches tall, and clean shaven.  On June 25, 1997, Peggy viewed a photographic lineup that did not include defendant.  The person in position four most resembled her assailant, but was not him.  On June 26, 1997, Peggy saw a second photographic lineup with defendant's photograph in position five.  She excluded the first five people as her attacker.  The man in position six bore the closest resemblance, but her

---

[3]     The ignition switch on another car in the trailer park had been tampered with, but the car was not stolen.

assailant had lighter skin and no facial hair. At the preliminary hearing, Peggy testified that the intruder was "Caucasian," but later described him as African American. She did not identify defendant at the hearing. She explained that her memory was poor due to chemotherapy treatments. Peggy died before trial. A videotape of her preliminary hearing testimony was played for the jury.

### 2. *Defense Case*

Defendant testified on his own behalf in narrative form.[4] He claimed that two other men, Knuck and Leon, were the killers. He had joined the two, believing they were going to a party. They drove to the trailer park where Knuck entered one of the homes. As Leon urged defendant to help him steal a car, Knuck approached and asked both men to help steal some property. Defendant refused and said he wanted to leave. Knuck and Leon reentered the mobile home and defendant heard them hitting someone whose voice sounded like a woman's. Knuck and Leon emerged and stole the Bakers' car. Defendant drove away in the car they had all arrived in.

The three spent the rest of the evening together. Knuck and Leon admitted what they had done in the mobile home. Knuck said Reginald escaped his bonds so Knuck beat him. The next day defendant asked to borrow the Bakers' car. He encountered a police officer but evaded detection and drove in the other direction. Based on Knuck and Leon's story, defendant thought they had only committed auto theft and assault. He saw no news coverage and decided to "be cool" and "keep [his]

---

[4] See *People v. Guzman* (1988) 45 Cal.3d 915, 941–946; *People v. Johnson* (1998) 62 Cal.App.4th 608, 629–630.

mouth shut." Two days later he went to Los Angeles and met Clayton. By this time he had learned that Reginald was dead. He told Clayton about the crimes, but not that he had committed them.

Defendant admitted that he had been convicted of robbery, several auto thefts, and being a felon in possession of a firearm. He had been released from prison just two weeks before the murder. He acknowledged telling Detective Wolford that he was responsible for the Baker crimes, and agreed he did not mention Knuck. At trial he refused to reveal Knuck's last name.

A photograph taken one week before the crimes showed defendant with a mustache and goatee. Latesha Wasson recalled defendant had the same facial hair on the night of the murder, and Clayton confirmed that defendant wore a mustache and possibly a goatee when they met in late June 1997.

### B. Penalty Phase

#### 1. Prosecution

The prosecution introduced evidence of defendant's other crimes. In January 1993, he stole a car and robbed a bank in Rancho Mirage. A month later he stole a Mercedes at gunpoint.

The prosecution also introduced evidence that, between 1990 and 2000, defendant was involved in four fistfights with other inmates while incarcerated. In 1992, defendant lunged at a prison doctor and required restraint.

Reginald and Peggy's son, Duane Baker, testified about the impact of the crimes. Reginald married Peggy when Duane was five years old. He was a wonderful husband, father, and grandfather, who was active in the community and volunteered at the fire department.

After Reginald's death, Peggy was frightened to stay home alone, worried that defendant would return to kill her. She lived with Duane for several weeks while he had her home cleaned and improved its security. She returned home after defendant's arrest. Lonely without Reginald, she lost interest in volunteering, bingo, and her music group. Peggy was diagnosed with cancer sometime in late 1998 or early 1999. She had a difficult time dealing with her diagnosis without Reginald's support. Duane and his children also missed Reginald, particularly his smile. According to Duane, Reginald "was a pretty happy guy most of the time and just that was a comfort."

### 2. Defense

Defendant represented himself at the penalty phase and presented no evidence.

## II. DISCUSSION

Defendant correctly argues that his statements were taken in violation of the Fifth Amendment right to counsel (*Miranda, supra*, 384 U.S. 436; *Edwards, supra*, 451 U.S. 477) because his unequivocal request for counsel was not honored.

### A. Background

Defendant was arrested in the early morning of July 5, 1997. About five hours later, Detective Wolford and Officer Herrera of the Cathedral City Police Department interviewed him. Defendant was read his *Miranda* rights and waived them both orally and in writing. The officers said they were investigating crimes committed against the Bakers at The Canyon trailer park on June 22, 1997 and asked what he was doing that evening. Defendant was reluctant to disclose his whereabouts. After a series of questions, defendant admitted

being in Cathedral City. When asked if he went to the trailer park, the following exchange occurred:

"[Defendant:] Uhm, there's some things that I, uhm, want uh . . .

"Det. Wolford: Did you go into the trailer park, that night?

"[Defendant:] [Want,] uh, want to, speak to an attorney first, because I, I take responsibility for me, but there's other people that . . .

"Officer Herrera: What do you . . .

"[Defendant:] . . . I need to find out . . .

"Officer Herrera: Paul.

"[Defendant:] . . . I need to find out.

"Officer Herrera: Paul, what do you accept responsibility for?

"[Defendant:] (No response)

"Officer Herrera: Do you accept responsibility for what happened inside that trailer park? Is that what you['re] talking about? Do you accept responsibility . . .

"[Defendant:] I never

"Officer Herrera: You['re] going to accept responsibility for what happened to that man? And that woman? We just talked about that, we just talked about that okay?

"[Defendant:] We just talked about.

"Officer Herrera: Then let's just talk about that, okay? We ain't gonna talk about nothing else, but just that. That's the only thing that affects you, that's all we can talk about. This ain't easy and we know this isn't gonna be easy for you but, not everything, not every question here is going to be something

that you want to be asked, okay? And they're not going to be easy but this is what we got to do."**5**

The officers asked defendant several more times how he took responsibility. They urged him to help himself and to think about his family. They asked if the victims had angered him. They observed, "You are not taking any responsibility by saying you're taking responsibility, that doesn't do nothing. It doesn't do nothing man, you gotta tell us what happened." Eventually defendant admitted to committing the crimes, as recounted above.

Defendant unsuccessfully moved to exclude his statements from evidence at the preliminary hearing and in a section 995 motion. His renewed motion was denied at trial. The trial court found that defendant validly waived his *Miranda* rights and did not invoke his right to counsel later in the interview. It explained: "It may be also that [defendant] might have wanted an attorney before he said anything further to Detective Wolford and [Officer] Herrera, but that is not clear that that was his position. It may also have been that he simply wanted to talk to an attorney about the issue of incriminating others at some point in time before he would answer any such of those questions. [¶] The bottom line to the court is that there are several reasonable interpretations that can be placed on Mr.

---

**5** The next line of the transcript reflects Detective Wolford saying: "Still want, help yourself, help, you gotta help yourself Paul." Our independent review of the audio recording raises a question whether the words "Still want" were in fact spoken by defendant, rather than Wolford. But because the audiotape is of poor quality, and the issue was not litigated by the parties below, we will rely on the transcript as accepted by the trial court. (*People v. Molano* (2019) 7 Cal.5th 620, 659.)

Henderson's statement about an attorney, and that choice of reasonable interpretation suggests to me that his comment was not at all unambiguous or unequivocal as defined in the *Davis* [*v. United States* (1994) 512 U.S. 452] case." The court further concluded that "I infer from the totality of circumstances in this transcript that the police did believe Mr. Henderson's reluctance centered around incriminating others, and I further find that it was reasonable for them to believe that."

### B. Invocation of the Right to Counsel

Defendant does not challenge his initial *Miranda* waiver. He contends, however, that the officers violated *Edwards*, *supra*, 451 U.S. 477, by continuing to question him after he invoked his right to counsel.

A defendant who has waived his *Miranda* rights may reinvoke them during the interrogation. If he clearly and unequivocally does so, police must stop questioning. (*Edwards*, *supra*, 451 U.S. at pp. 478–479, 482, 485; *Miranda*, *supra*, 384 U.S. at pp. 473–474.) Once a suspect has invoked his right to counsel, police may not resume questioning until counsel is provided or the suspect himself reinitiates contact. (*Edwards*, at pp. 484–485; accord, *People v. Gamache* (2010) 48 Cal.4th 347, 384.) "*Edwards* set forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel. [Citation.] In the absence of such a bright-line prohibition, the authorities through 'badger[ing]' or 'overreaching' — explicit or subtle, deliberate or unintentional — might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." (*Smith v. Illinois* (1984) 469 U.S. 91, 98.)

"In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence or counsel." (*People v. Stitely* (2005) 35 Cal.4th 514, 535, quoting *Davis v. United States*, *supra*, 512 U.S. at p. 459.) Ambiguous or equivocal references to an attorney are not sufficient. (*Davis*, at pp. 459, 461–462.) The suspect must express his desire for counsel with sufficient clarity "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Id.* at p. 459.) "[T]his is an objective inquiry." (*Ibid.*) "[A]fter a suspect makes a valid waiver of the *Miranda* rights, the need for effective law enforcement weighs in favor of a bright-line rule that allows officers to continue questioning unless the suspect clearly invokes the right to counsel or right to silence." (*People v. Nelson* (2012) 53 Cal.4th 367, 377.)

On review, " 'we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*.' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269; accord, *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.) Here, the facts are undisputed. The question is whether they established that defendant clearly invoked his right to an attorney.

Various cases have held that a suspect's use of equivocal words or phrases does not constitute a clear request for counsel's assistance. (See, e.g., *Davis v. United States*, *supra*, 512 U.S. at p. 462 [" 'Maybe I should talk to a lawyer' "]; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219 [" 'If you can bring me a lawyer' "]; *People v. Bacon* (2010) 50 Cal.4th 1082, 1105 [" 'I think it'd probably be a good idea for me to get an attorney' "];

cf. *People v. Stitely*, *supra*, 35 Cal.4th at p. 535 [" 'I think it's about time for me to stop talking' "].) Defendant used no such equivocal language here. He clearly stated, "[I] want to, speak to an attorney first," and twice emphasized, "I need to find out." He tried to speak further, but Officer Herrera spoke over him.

The People argue that defendant's comment, "because I, I take responsibility for me, but there's other people that . . . ," rendered his invocation ambiguous. They urge a reasonable officer could understand defendant's reference to taking responsibility as an indication that he was willing to continue speaking to the officers about his own liability notwithstanding his request for counsel. To support this view, the People look to the content of the statement itself and the comments leading up to it. They urge that the invocation question must be evaluated in light of the context in which the statements were made.

"In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends." (*People v. Williams* (2010) 49 Cal.4th 405, 429 [discussing initial waiver of the right to counsel]; cf. *Smith v. Illinois*, *supra*, 469 U.S. at p. 98 ["Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease"].)

Although context is relevant, the People's interpretation of this record is untenable. Defendant clearly said he wanted to talk to a lawyer. Although not required, he went on to explain why he wanted counsel. Further, his explanation did not create an ambiguity. There is nothing inconsistent or ambiguous about wanting to speak to an attorney before taking responsibility,

and defendant made clear that he wanted to speak to an attorney "first." One can take responsibility in ways other than giving an uncounseled confession to the police.

Circumstances preceding the invocation provide context that undermines the People's argument. Defendant was extremely hesitant to answer the officers' questions. Asked if he remembered what he was doing on the night of the murder, he gave no response. Asked who he was with that night, he was reluctant to say. Asked again if he remembered what he was doing, defendant said "I remember something, (Inaudible), but before I answer the question about (Inaudible) I'm not sure." When asked if he was concerned about implicating another person and if he was interested in learning about what others had said to the police, defendant said, "I don't know, I'm contemplating, I don't want to (sigh)." Encouraged to disclose his state of mind that night, he did not respond. When officers asked if he was in Cathedral City, defendant initially did not answer, but ultimately said, "Yes." He did not respond when asked if he had walked to the trailer park. Officer Herrera told defendant, "This ain't easy," and Detective Wolford urged him to "[c]ome on." Still, defendant did not respond. After Officer Herrera cautioned defendant about "try[ing] to think one step ahead of us," defendant invoked his right to counsel and twice insisted, "I need to find out." Speaking over him, Officer Herrera again asked what he took responsibility for. Defendant was initially silent, and then said, "I never." This context does not bear out the People's argument that a reasonable officer could believe defendant was willing to continue the interview notwithstanding his request for counsel.

To be clear, after being admonished and waiving their rights, suspects may give halting or reluctant answers. They

may give responses that the questioners suspect are false. Officers are permitted to encourage a subject to talk and to challenge statements as untrue. What they cannot do is brush aside a clear invocation.

The People's attempt to contextualize defendant's words is further undermined by the fact that defendant was precluded from fully articulating his request for counsel because Officer Herrera repeatedly spoke over him. The People argue that defendant and the officer each talked over the other. Certainly, that dynamic can take place during a contentious interrogation, but it is not what happened here. When Detective Wolford asked if he had been to the trailer park, defendant directly said he wanted to speak to an attorney first and began to elaborate on that request. Then Officer Herrera intervened, repeatedly asking what he took responsibility for. Officer Herrera's comments notwithstanding, defendant twice emphasized, "I need to find out," further conveying he wished to speak with counsel before answering *any* questions. " 'No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all.' " (*Smith v. Illinois*, *supra*, 469 U.S. at p. 99.) Fairly read, defendant's request for counsel was clear and unequivocal.

The circumstances differ from those addressed in *People v. Flores* (2020) 9 Cal.5th 371, on which the People rely. Flores was advised of his *Miranda* rights and participated in a lengthy interview about homicides committed in San Bernardino County. The following day, Lieutenant Kusch of the Los Angeles Police Department approached Flores to speak about a different

homicide committed in Los Angeles County. Kusch restated the *Miranda* rights, and Flores indicated that he understood them. (*Id*. at p. 415.) Kusch then said, " 'Basically what I'd like to do is talk about the the [*sic*] case that we investigated that we got called out on back on November 17th, 2000. Uh I'll tell you how we got called out on it in a minute but uh do you want to take a few minutes to talk a little bit about that?' " (*Ibid*.) Flores responded " 'No' " or " 'Nah.' " (*Ibid*.) Kusch attempted to clarify Flores's response by explaining that he wanted to give Flores some details about the investigation and get some background information from him. Kusch emphasized three times that Flores was not required to answer any questions. He then asked " 'Do you want to take a few minutes and talk to me about that stuff?' " to which Flores replied, " 'Oh yeah, well whatever.' " (*Id*. at p. 416.) The interview continued, and eventually Flores admitted to killing the victim.

We held that Flores's "No" response was equivocal because it could have been understood either as an invocation of his rights or merely a negative response to Kusch's offer to explain how the investigation started. (*People v. Flores*, *supra*, 9 Cal.5th at p. 419.) We noted that "the clarity of a suspect's answer may depend in part on the clarity of the officer's question." (*Ibid*.) Because Kusch's question was imprecise and poorly framed, the defendant's answer "could have meant either, 'No, I do not want to talk to you at all,' or 'No, I do not want to hear about how the police got called out.' " (*Ibid*.) Flores may have been focused on the latter subject because his own mother had provided information that helped lead the police to him. (*Id*. at pp. 419–420.) Flores smiled and gave a short laugh when he said, "No." The dissonance between his demeanor, his cooperation the previous day in another homicide investigation, and his "No"

response was potentially confusing. (*Id.* at p. 420.) Given all of these circumstances, we concluded that Kusch properly asked a neutral follow-up question to clarify Flores's intent. (*Id.* at pp. 418–421, 424.)

Here, Detective Wolford's question prompting defendant's invocation was neither imprecise nor poorly framed. He asked directly, "Did you go into the trailer park, that night?" In response, defendant said that he wanted to speak to an attorney first. Nothing in the preinvocation context dilutes the plain import of defendant's request for counsel. Instead of honoring his unambiguous request, the officers repeatedly asked defendant what he took responsibility for and said, "[L]et's just talk about that, okay?" emphasizing "this is what we got to do." Certainly, context matters, but it cannot be used to cast a clear invocation in a different light. In an interrogation officers frequently control the narrative. They may do so, among other reasons, to keep the statement focused and coherent. But they may not use otherwise legitimate control to obfuscate a suspect's attempt to invoke his rights.

The trial court concluded that a reasonable officer could understand defendant's reference to "other people" as a limited invocation of the right to counsel only as to those questions that could potentially implicate others. Upon independent review, the conclusion does not withstand scrutiny.

Courts have recognized that an invocation can be limited to certain situations or topics. In *Connecticut v. Barrett* (1987) 479 U.S. 523, for example, the defendant said that he was willing to speak to police about a sexual assault but would not give a written statement unless his attorney was present. (*Id.* at pp. 525–526.) The high court found the statement admissible,

reasoning: "Barrett's limited requests for counsel . . . were accompanied by affirmative announcements of his willingness to speak with the authorities. The fact that officials took the opportunity provided by Barrett to obtain an oral confession is quite consistent with the Fifth Amendment. *Miranda* gives the defendant a right to choose between speech and silence, and Barrett chose to speak." (*Id.* at p. 529.) The court rejected the view that defendant had requested an attorney for all purposes as contrary to the "ordinary meaning" of his words. (*Id.* at p. 530.)

In *People v. Martinez* (2010) 47 Cal.4th 911, the defendant said, " 'I think I should talk to a lawyer *before I decide to take a polygraph.*' " (*Id.* at p. 952, italics added.) We found that statement conditional. The italicized phrase supported the conclusion that "defendant only wanted the assistance of counsel if he was taking a polygraph exam." (*Ibid.*) Because no polygraph exam was administered, the detectives were not obligated to seek clarification either then or at a second interview the following morning. (*Ibid.*; accord, *People v. Gonzalez*, *supra*, 34 Cal.4th at p. 1126 [defendant's statement that "he wanted a lawyer *if* he was going to be *charged*" was conditional].)

In *People v. Michaels* (2002) 28 Cal.4th 486, the defendant waived his *Miranda* rights and the detectives asked him " 'what's your side of the story? What happened?' " (*Id.* at p. 509.) The defendant responded, " 'I don't know if I should without an attorney.' " (*Ibid.*, italics omitted.) The detective then emphasized that " '[i]f there's any time that we ask you a question that you don't want to answer, you can stop at any time,' " to which the defendant replied, " 'Okay, *that* one.' " (*Ibid*, some italics omitted.) We held that the defendant's

statement implied "a refusal to answer a particular question . . . . . Defendant did not assert a right to refuse to answer any questions, ask that the questioning come to a halt, or request counsel. Instead, he was showing that he knew he could refuse to answer any or all questions and would exercise this right on a question-by-question basis." (*Id.* at p. 510; accord, *People v. Silva* (1988) 45 Cal.3d 604, 629–630 ["A defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress' "].)

Defendant's statement, "because I, I take responsibility for me, but there's other people that . . . ," cannot reasonably be construed as a limited invocation of the right to counsel only as to those questions implicating others. Defendant was not referring to certain topics he wished to avoid, but rather to the *reason* he wanted counsel's advice. Of course, defendant was not required to explain or justify his request for counsel. The choice is his alone and for reasons of his own. To the extent he did try to explain, his concern about the liability of others did not necessarily preclude a concern about his own liability. On the contrary, the actions and intentions of accomplices may bear heavily on a defendant's guilt of the crimes.

It is true defendant said that he wanted to "speak to an attorney *first*." (Italics added.) But the reference to "first" is most fairly understood to mean before making a *statement*. This comment is different from that in *Martinez*, where the defendant indicated he wanted to speak to a lawyer " '*before* I decide to take a *polygraph*.' " (*People v. Martinez, supra,* 47 Cal.4th at p. 952, second italics added.)

The trial court here looked to "the totality of circumstances in this transcript" to conclude that the officers reasonably believed defendant's reluctance to speak centered around incriminating others. The court observed, for example, that several times *before* the invocation, the officers assured defendant that they were not seeking to implicate others. It inferred from this discussion that defendant's reluctance to speak without an attorney likewise centered around this topic. Notably, however, the question that immediately preceded defendant's invocation centered on *his* actions: "Did you go into the trailer park, that night?" Although the topic of incriminating others had been raised earlier in the interview, it was repeatedly interjected by the officers, not defendant.[6] The

---

[6] For example, at the outset of the interview, Officer Herrera said, "Remember what you were doing when it got dark? [Where you were at?] Now, let me, let me, ahead of time I'm going to say this okay? Uhm, I'm not trying to fuck anybody else over here, okay we['re] not trying to, you know, incriminate anybody else . . . ." Detective Wolford then asked defendant if he was at someone's house that night. When defendant indicated he did not want to say, Officer Herrera responded, "You don't want to get, you think that you can get incriminated or get somebody else all caught up in this mess or something or what? You don't want to drop no names, or you just, you don't remember? Huh?" Defendant responded, "I remember something, but . . . it's (Inaudible) I remember something, (Inaudible), but before I answer the question about (Inaudible) I'm not sure." Detective Wolford then asked, "[Y]ou were at somebody's house that you don't want to disclose, that night?" Defendant replied that he was with someone he respected and that he did not want her to be in trouble. The officers then asked defendant, "You don't want to talk about that person, is that what you're talking about? . . . Or do you want [to] know if she said something to us?" Defendant responded, "I don't know, I'm

discussion therefore sheds little light on how to objectively construe defendant's invocation. If anything, his request for counsel in the face of the officers' repeated assurances that they would not question him about others' involvement suggests an invocation beyond that limited topic.

The court also observed that, after the invocation, defendant asked to use the restroom. Following an eight-minute break, he continued to speak with officers, prompting the court to infer that he did so freely. But this approach has been criticized by the high court: "The courts below were able to construe [the defendant's] request for counsel as 'ambiguous' *only* by looking to [his] *subsequent* responses to continued police questioning and by concluding that, 'considered in total,' [the defendant's] *'statements'* were equivocal. [Citations]. This line of analysis is unprecedented and untenable. As Justice Simon emphasized below, '[a] statement either is such an assertion [of the right to counsel] or it is not.' [Citation.] Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred

---

contemplating, I don't want to (sigh)." Officer Herrera replied, "This isn't helping trying to think one step ahead of us here, okay? We're not trying to involve anybody else, drag anybody else down with you, or anything like that, okay?" He explained, "[W]e know when it happened, we wanted to know what happened before then, the state of mind was what was going on with you, okay? That's what you said you were going to talk to us about, all right?"

by merging them together." (*Smith v. Illinois*, *supra*, 469 U.S. at pp. 97–98, fn. omitted.) "Our decision is a narrow one. . . . We hold only that, under the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." (*Id*. at pp. 99–100.)

Under *Edwards*, the officers were required to stop the interrogation once defendant unequivocally requested counsel. (*Edwards*, *supra*, 451 U.S. at pp. 484–485.) They did not do so. Defendant's postassertion statements in response to the officers's continued questioning did not amount to a valid waiver of the right to counsel he had invoked. (*Id*. at p. 487.) Accordingly, his statements were inadmissible as substantive evidence at trial. (*Ibid*; accord, *Maryland v. Shatzer* (2010) 559 U.S. 98, 111, fn. 7; *Montejo v. Louisiana* (2009) 556 U.S. 778, 787; *McNeil v. Wisconsin* (1991) 501 U.S. 171, 177; *Arizona v. Roberson* (1988) 486 U.S. 675, 681–682.)

*C. Prejudice*

The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the *Chapman* standard (*Chapman v. California* (1967) 386 U.S. 18, 24). (*People v. Elizalde* (2015) 61 Cal.4th 523, 542.) That test requires the People "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, at p. 24.) The standard is satisfied only if "[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1314.) Because

confessions " '[a]lmost invariably' will provide persuasive evidence of a defendant's guilt . . . , the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-error standard." (*People v. Cahill* (1993) 5 Cal.4th 478, 503 (*Cahill*).)

Defendant's admissions were the "centerpiece of the prosecution's case," offered to prove he was the assailant. (*Cahill*, *supra*, 5 Cal.4th at p. 505.) Peggy could not identify her attacker. Her descriptions of the perpetrator were internally inconsistent and differed from defendant in significant details. Nor could Deputy Elders identify defendant as the driver who evaded pursuit the morning after the murder. No fingerprint or biological evidence linked defendant to either the Bakers' car or residence. No property belonging to them was found in his possession.

Wasson saw defendant in a car similar to the Bakers' just after midnight on the night of the crimes. And Elam testified that defendant said he was involved in a police pursuit the next day. This testimony had some tendency to connect defendant to the Bakers' stolen car. But his connection to the crimes committed at the Bakers' home was attenuated.

Clayton testified that defendant confessed to him, but his account was open to substantial attack. At one point he said defendant admitted to acting alone. But he also claimed that defendant told him the victims were dignitaries who were killed by two professional hit men and that Reginald had been stabbed repeatedly. According to Clayton, defendant described the victims as prominent citizens with assets he could use to pay off a debt to the two men. These claimed admissions were

inconsistent with the facts of the crimes. Clayton's credibility was further undermined by his lengthy criminal record, his inquiry to law enforcement officers and reporters about the facts of the crime, and his motivation to secure a reward.

After defendant's interview, an officer was standing in an open doorway of the interrogation room. He testified he overheard defendant tell his aunt, "Yes, I'm sorry. I didn't mean to *kill him*." (Italics added.) But that evidence was disputed. Defendant's aunt, with whom he was speaking, denied under oath that defendant made such a statement. On the audiotape of the conversation defendant is heard sobbing, and the tape is of such poor quality that the italicized words are unintelligible. The recording failed to resolve the dispute and, without his confession, it may have caused the jury to doubt the officer's ability to discern defendant's words.[7]

In *Cahill, supra,* 5 Cal.4th 478, we acknowledged that erroneous admission of a confession "might be found harmless, for example, (1) when the defendant was apprehended by the police in the course of committing the crime, (2) when there are

---

[7] Defendant's own testimony at trial placed him at the scene, although he maintained that two other men, "Knuck and Leon," committed the crimes. On cross-examination he confirmed that he had answered affirmatively when his aunt asked him if he had "murder[ed] that man" and that he told her, "I didn't mean to kill him. I didn't mean to kill him. I'm so sorry." Defendant argues that his testimony should not be considered in evaluating prejudice because his decision to testify flowed from the erroneous introduction of his pretrial statements. The People do not dispute this point in their briefing, nor do they rely on defendant's testimony to establish that the error was harmless beyond a reasonable doubt. Accordingly, we will discount that evidence as well.

numerous, disinterested reliable eyewitnesses to the crime whose testimony is confirmed by a wealth of uncontroverted physical evidence, or (3) in a case in which the prosecution introduced, in addition to the confession, a videotape of the commission of the crime . . . ." (*Id*. at p. 505.) Certainly, *Cahill*'s list of examples is not intended to be exhaustive. But it does exemplify the kind of strong evidence required to satisfy the *Chapman* standard.

Such compelling evidence is absent here. Instead, this case is arguably weaker than that in *People v. Neal* (2003) 31 Cal.4th 63, where we reversed a conviction due to the erroneous admission of the defendant's confessions. In that case, the victim, Collins, was strangled in the home he shared with Neal. After the murder, Neal left in Collins's car. A note, purportedly written by the victim's foster son, took responsibility for the killing. (*Id*. at pp. 69–70.) A documents expert opined, however, that the note was in Neal's handwriting. (*Id*. at p. 87.) After his arrest, Neal confessed to killing Collins. (*Id*. at pp. 74–76.) At trial, he testified that he strangled Collins after Collins tried to forcibly sodomize him. (*Id*. at p. 71.) We concluded that the erroneous admission of Neal's confessions was not harmless beyond a reasonable doubt, even though other evidence pointing to Neal was sufficient to support the jury's verdict. (*Id*. at p. 87.) We explained: "[T]he confessions, with their detail and general consistency with each other and with extrinsic facts, functioned as the veritable 'centerpiece of the prosecution's case in support of . . . conviction.' " (*Ibid.*, quoting *Cahill, supra*, 5 Cal.4th at p. 505.)

The same is true here. Without defendant's statements, the case rested primarily on defendant's connection to the Bakers' car and on the testimony of Clayton, whose veracity was

susceptible to substantial attack. On this record, we cannot conclude that erroneous admission of defendant's statements was harmless beyond a reasonable doubt as to any of the jury's findings.

## III. DISPOSITION

We reverse the judgment in its entirety and remand the case to the trial court for further proceedings.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Henderson

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S098318
**Date Filed:** July 30, 2020

_____

**Court:** Superior
**County:** Riverside
**Judge:** Thomas N. Douglass, Jr.

_____

**Counsel:**

Martin H. Dodd, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Ronald S. Matthias and Julie L. Garland, Assistant Attorneys General, Ronald A. Jakob, Holly D. Wilkens, Robin Urbanski and Jennifer A. Jadovitz, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Martin H. Dodd
Futterman Dupree Dodd Croley Maier LLP
601 Montgomery Street, Suite 333
San Francisco, CA 94111
(415) 399-3840

Ronald A. Jakob
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9213