Filed 9/29/21  P. v. Negrete CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>CARMEN NEGRETE,<br><br>    Defendant and Appellant. | G059173<br><br>(Super. Ct. No. 18NF1031)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

Aaron Spolin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

## INTRODUCTION

A jury convicted defendant Carmen Negrete of three counts of committing sex crimes against his minor stepdaughter, A.C., one count of attempting to dissuade A.C. from testifying while Negrete was released from custody on bail, and one count of violating a protective order. We affirm.

Negrete raises two issues on appeal. First, he contends the trial court erroneously denied his motion to exclude his statements to a police detective during an interview at the police station because he had invoked his right to counsel. Based upon our independent review of the video-recorded interview, we conclude Negrete's motion was correctly denied because his statements were ambiguous and the detective's clarifying follow-up questions were reasonable. Negrete's responses to the detective's follow-up questions confirmed Negrete was not invoking his right to counsel.

Second, Negrete contends the evidence was insufficient for the jury to find he had accomplished one of his crimes by duress. Given Negrete's relationship to A.C., substantial evidence supports the jury's finding of duress.

## CHARGES, CONVICTIONS, AND COUNTS AT ISSUE ON APPEAL

### I. PROCEDURAL HISTORY

Negrete was charged in an amended information with continuous sexual abuse of a child under the age of 14 years (Pen. Code, § 288.5, subd. (a) [count 1]);[1] committing a lewd act upon a child of 14 or 15 years of age (§ 288, subd. (c)(1) [count 2]); sexual penetration of a child 14 years of age or older by a foreign object by means of force, violence, duress, menace, or fear (§ 289, subd. (a)(1)(C) [count 3]); attempting to dissuade a witness from testifying (§ 136.1, subd. (a)(2) [count 4]); and violating a court protective order (§ 166, subd. (c)(1) [count 5]). The amended information also alleged as

---

[1] All further statutory references are to the Penal Code.

2

a sentencing enhancement that Negrete committed count 4 while he was released from custody on bail.  (§ 12022.1, subd. (b).)

A jury found Negrete guilty on all counts and found true the sentencing enhancement allegation.  The court sentenced Negrete to a total prison term of 24 years as follows:  16 years for count 1, two years concurrent for count 2, eight years consecutive for count 3, and two years concurrent for count 4.  The court struck the sentencing enhancement for count 4, and suspended execution of sentence for count 5.

Negrete's appellate contention that he invoked his right to counsel under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) implicates counts 1 through 3.  His substantial evidence challenge affects the duress element of count 3 only.

II.  FACTS AND TRIAL COURT PROCEEDINGS[2]

A.

*After Eight Years of Being Molested by Negrete, A.C. Reports the Abuse*
*to Her Mother, Leading to a Criminal Investigation*

Negrete met then six-year-old A.C. when he was dating A.C.'s mother. Negrete moved in with A.C. and her mother; he later married A.C.'s mother.  Although A.C. did not initially like Negrete because she felt he was trying to replace her biological father, over time, A.C. grew to view Negrete as the only "father figure" in her life.  A.C. eventually trusted Negrete only and did not trust her mother because, starting when A.C. was seven years old, Negrete told A.C. that her mother did not love A.C. and that her mother cheated on Negrete.

Negrete began molesting A.C. when she was seven years old and continued to sexually abuse her for the next seven years.  In 2016, when A.C. was 14 years old, Negrete penetrated A.C. with an object.  The following month, A.C. disclosed Negrete's ongoing sexual misconduct to her mother, who reported the abuse to a counselor.

---

[2] The facts in this section are taken from trial testimony and are limited to those relevant to the issues on appeal.

3

That same day, Detective William Segletes of the Anaheim Police Department contacted Negrete at Negrete's barbershop business in Fullerton. Negrete told Segletes he had recently touched A.C. on her breasts and buttocks without any sexual intentions, during isolated incidents. At the end of the interview, Negrete was placed under arrest and transported to a police station.

B.

*Negrete's Police Station Interview*

Later that day, Segletes interviewed Negrete at the police station. Before beginning the interview, Segletes read Negrete his rights under *Miranda.* After Negrete confirmed his understanding of each right, Segletes asked: "With those rights in mind, can I ask you some questions?" The following discussion ensued:[3]

"NEGRETE: Well, I, I like to speak to a lawyer because I don't know what, what's going on. You know what I mean. Like I know that I'm going through this, but I don't know what to say or what not, you know what I mean?

"SEGLETES: Okay. So are, are you sayin' you don't wanna talk to me before you talk to a lawyer or do you just think you should talk to a lawyer?

"NEGRETE: I think I should talk to a lawyer. *I'm not saying that I wouldn't answer your questions.* You know what I mean.

"SEGLETES: Okay. I get that.

"NEGRETE: I, I think you been pretty fair with me, so.

"SEGLETES: Yeah. That's what I try to do.

"NEGRETE: Um, so I don't, I don't you're a bad guy at all. I think you know, you're doing your job.

"SEGLETES: Okay.

"NEGRETE: And I made a mistake.

---

[3] We quote the transcript verbatim that was before the judge in his ruling on Negrete's motion to exclude. All italics are added.

4

"SEGLETES:  Okay.

"NEGRETE:  And I need to pay for my consequences.  You know what I mean.  So.

"SEGLETES:  Okay.  I get that.

"NEGRETE:  Um, um, I'm, I'm really upset at myself man, so . . .

"SEGLETES:  Okay.  Okay.  I, I get that, and I get that from you.  *But, I just wanna understand.  Are you saying that we should stop talking until you talk to an attorney or do you wanna continue to talk?*

"NEGRETE:  *I can answer your question*.

"SEGLETES:  Okay.

"NEGRETE:  If, if I . . . if I don't wanna answer one of your questions could I just not answer it or it is that?

"SEGLETES:  Uh, yes, you can.  You can, you can say that you don't wanna answer a question I definitely understand that.  'Cause as we already talked earlier while we were in your shop.  It, I'm gonna ask some freakin', uh, question that embarrass me in the inside, might embarrass you about the subject matter 'cause that's kinda what I investigate.  So, we'll, we'll get to that and if you don't wanna answer it because of embarrassment of something else.  I understand that.  I'm just wanna at least hear your side of it like you said, it.  You made a mistake, I get that.  Okay.  That, we just wanna help and move on with that.

"NEGRETE:  Yes of course.

"SEGLETES:  And I just have to complete me due diligence of . . .

"NEGRETE:  I understand that.

"SEGLETES:  . . . asking every question and doing all the paperwork.

"NEGRETE:  I understand.

5

"SEGLETES:  So, what, what can you tell me about, uh, what's going on between you and [A.C.]?"

Negrete thereafter reiterated statements similar to those he had made at the barbershop:  He maintained he had only touched A.C.'s breasts and buttocks during recent isolated incidents.  Negrete also stated he "was molested, too" when he was young and that "I, I . . . I had to put her what what I went through a little bit, you know."

C.

*The Trial Court Denies Negrete's Motion to Exclude His Police Station Statements.*

On the first day of trial, Negrete moved to exclude from evidence his police station interview statements on the ground he had invoked his right to counsel.  The trial court, denying the motion, concluded Negrete had not unambiguously and unequivocally invoked his right to counsel.

**DISCUSSION**

On appeal, Negrete challenges his sex offense convictions (counts 1 through 3) on the ground that he unambiguously and unequivocally invoked his *Miranda* right to counsel.  He also argues insufficient evidence supports the duress element on count 3.

I.  NEGRETE'S POLICE STATION STATEMENTS WERE PROPERLY ADMITTED BECAUSE HIS STATEMENTS WERE AMBIGUOUS AS TO WHETHER HE WAS INVOKING HIS RIGHT TO COUNSEL AND SEGLETES PROPERLY SOUGHT CLARIFICATION

A.

*Standard of Review*

In reviewing the trial court's ruling on the motion to exclude Negrete's police station statements, "'it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by

6

substantial evidence.  We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.'"  (*People v. Flores* (2020) 9 Cal.5th 371, 418 (*Flores*); see *People v. Carter* (2005) 36 Cal.4th 1114, 1146.)  Negrete's video-recorded police station interview provides undisputed facts that we review independently.  (*People v. Duff* (2014) 58 Cal.4th 527, 551 (*Duff*).)

B.

*Relevant Law*

A defendant may invoke his right to counsel at any time during a custodial interrogation by making an unambiguous and unequivocal request to exercise the right. (*People v. Henderson* (2020) 9 Cal.5th 1013, 1028 (*Henderson*).)  "For a statement to qualify as an invocation of the right to an attorney, however, the defendant . . . 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'"  (*People v. Cunningham* (2015) 61 Cal.4th 609, 646, quoting *Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*).)  If a request unambiguously and unequivocally invokes the right to counsel, "police may not resume questioning until counsel is provided or the suspect himself reinitiates contact."  (*Henderson, supra*, 9 Cal.5th at p. 1022, citing *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485.)

If, however, a defendant "makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel . . . cessation of questioning" is not required.  (*Davis, supra*, 512 U.S. at p. 459.)  In that situation, the officer may but is not required to ask for clarification from the defendant.  (See *Duff, supra*, 58 Cal.4th at p. 553; see also *Davis, supra*, 512 U.S. at p. 462 ["we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect

7

*might* want a lawyer.  Unless the suspect actually requests an attorney, questioning may continue"].)  "In certain situations, statements that might seem clear in isolation 'actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends.  In those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of follow-up questions to render more apparent the true intent of the defendant.'"  (*Flores, supra*, 9 Cal.5th at p. 418.)

C.

*Analysis*

Negrete asserts that both his initial post-*Miranda* warning response and follow-up response to Segletes were independently clear enough to invoke Negrete's right to counsel.  We conclude Negrete did not unambiguously and unequivocally invoke his right to counsel because a reasonable officer under the circumstances could have justifiably inferred that Negrete *might* have been invoking his right to counsel but was not unequivocally communicating an unwillingness to speak to Segletes without a lawyer present.  (See *People v. Molano* (2019) 7 Cal.5th 620, 659-660.)

As quoted *ante*, after reading Negrete his rights under *Miranda*, Segletes asked him:  "With those rights in mind, can I ask you some questions?"  Negrete responded:  "Well I, I like to speak to a lawyer because I don't know what, what's going on.  You know what I mean.  Like I know that I'm going through this, but I don't know what to say or what not, you know what I mean?"

Segletes reasonably interpreted Negrete's initial response as ambiguous.  Although Negrete expressed he would like to speak to a lawyer, the rest of his initial response created ambiguity as to whether he was invoking his right to counsel.

Negrete reinforced the equivocal nature of his initial response by concluding it with the question, "You know what I mean?"  What Negrete subjectively

8

meant does not control our objective inquiry. (*Davis, supra*, 512 U.S. at pp. 458-459.) Although he might have been asking his question rhetorically, a police officer could also have reasonably understood Negrete as asking a genuine question inviting more discussion.

Segletes reasonably followed up to clarify what Negrete meant: "Okay. So are, are you sayin' you don't wanna talk to me before you talk to a lawyer or do you just think you should talk to a lawyer?" Segletes's follow-up question was neutral and he did not talk over Negrete in any way or otherwise prevent him from fully articulating his intention. (See *Henderson, supra*, 9 Cal.5th at pp. 1023-1024.) Segletes "did not in any way badger [Negrete] nor otherwise use coercive tactics to induce a waiver of his right to" counsel. (*Flores, supra*, 9 Cal.5th at pp. 418, 422, 424.)

Negrete's follow-up response suggested he would like to eventually talk to a lawyer but was willing to continue the interview: "I think I should talk to a lawyer. I'm not saying that I wouldn't answer your questions. You know what I mean." Given the options posed by Segletes, the first sentence of Negrete's follow-up response could reasonably have been interpreted as opting to speak to Segletes without first talking to a lawyer and the second could have reasonably confirmed an objective understanding that Negrete was *not* conditioning his discussion with Segletes on having a lawyer present.

Any doubt about whether Negrete was invoking his right to counsel was removed when Segletes asked, "Okay. Okay. I, I get that, and I get that from you. But, I just wanna understand. Are you saying that we should stop talking until you talk to an attorney or do you wanna continue to talk?" and Negrete responded, "I can answer your question."

In sum, Negrete's initial post-*Miranda* warning response ambiguously communicated whether he was willing to speak to Segletes without first receiving assistance from counsel and, therefore, Segletes was permitted to ask reasonable follow-

9

up questions to clarify Negrete's intention on invoking his right to counsel. Negretes's follow-up response clearly indicated his willingness to communicate with Segletes without counsel. We reject Negrete's contention that he unambiguously and unequivocally invoked his right to counsel.

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S FINDING THAT NEGRETE USED DURESS IN THE COMMISSION OF COUNT 3

### A.

#### *Standard of Review*

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

### B.

#### *Relevant Law*

Negrete was convicted in count 3 of violating section 289, subdivision (a)(1)(C), which provides: "Any person who commits an act of sexual penetration upon a minor who is 14 years of age or older, when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, shall be punished by imprisonment in the

10

state prison for 6, 8, or 10 years." Duress means "'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.'" (*People v. Leal* (2004) 33 Cal.4th 999, 1004, italics omitted (*Leal*).) A parent-child relationship factors heavily in determining whether a child victim was under duress at the time sex crimes were committed against him or her. (See, e.g., *People v. Veale* (2008) 160 Cal.App.4th 40, 47-48 [implied threat posed by stepfather sufficient for finding of duress].)

## C.

### *Analysis*

Negrete argues there was insufficient evidence of duress to uphold his conviction on count 3. We conclude substantial evidence supports the jury's finding of duress in count 3.

It was reasonable for the jury to infer from the trial evidence that A.C. was psychologically coerced by Negrete's parental role in her life and home. The evidence showed Negrete had acted as a father figure, alienated A.C. from her mother, and generally exerted parental control over A.C.

A.C. testified she remembered she was 12 years old when Negrete first directly touched her vagina because that was when she wrote a suicide letter to her mother, who found it just before Negrete was arrested about two years later. When asked at trial why she had written it, A.C. testified: "I couldn't take it anymore, all the secrets from my mom and not being close to my brother and sister. And then I couldn't like hang out with my friends because he wouldn't let me. I couldn't join sports. I basically was under like – inside the house all the time. He told me what I could wear and what I couldn't wear. He told me when I could have my hair down and when I couldn't."

11

A.C. explained that after writing the letter: "I guess, since, you know, I didn't want to talk to my mom and I didn't tell him anything of how I was feeling, I just changed mentally, tried to go on the other side, see like if it would change anything. And it kind of did because I didn't feel like, I guess, scared because he was there." A.C. testified she had loved Negrete because "he was like building up to it ever since [she] was small," until a therapist helped her see the relationship was wrong and that it was not her fault. A.C. testified that Negrete was "good at manipulating people, so he makes you feel like you're the one that's against him." A.C. elaborated that Negrete "would talk to me, like brainwash me, making me feel like that I needed him, that he was there for me, that he would do whatever it takes to make me happy."

On the specific circumstances of Negrete penetrating A.C. with the object, the prosecutor asked at trial: "Why did you listen to [Negrete]?" A.C. responded: "[b]ecause I trusted him ever since I was small." The closeness of the relationship between stepfather Negrete and stepdaughter A.C. provided the jury grounds to reasonably decide that A.C.'s submission to Negrete's acts was a result of Negrete's parental position. The closeness was never disputed by Negrete.

Negrete was the financial support for A.C. and her family, and hardship has been held an appropriate ground for finding duress. (*Leal, supra*, 33 Cal.4th at p. 1007.) It was reasonable for the jury to infer that A.C. was psychologically coerced by Negrete's role in her life and home.

The jury concluded that, at a minimum, A.C. was telling the truth, and Negrete was lying, about the material points necessary to convict Negrete of his crimes,

12

including count 3.  The evidence presented at trial more than sufficiently supports the jury's finding of duress.

## DISPOSITION

The judgment is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.