Filed 11/23/20  P. v. Quiroz-Muniz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ALFREDO QUIROZ-MUNIZ,<br><br>  Defendant and Appellant. | G058063<br><br>(Super. Ct. No. 17WF0527)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Patrick Donahue, Judge.  Affirmed as modified.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland,  Assistant Attorney General, Arlene Sevidal, Randall Einhorn, and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

In this gang-related killing, a jury convicted defendant Alfredo Quiroz-Muniz of premeditated and deliberate first degree murder. It also found true a criminal street gang special-circumstance allegation, and that defendant personally used a firearm in the commission of the murder. The trial court sentenced defendant to life without the possibility of parole, plus a consecutive 25 years to life for the firearm enhancement. It awarded him custody credits of 821 days.

Defendant raises six claims on appeal: (1) The trial court erred by admitting his statements to police allegedly obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). (2) The court erred in the way it instructed the jury regarding one of his justifiable homicide defenses. (3) The prosecutor committed reversible misconduct in closing argument by making an improper propensity argument based on defendant's gang membership. (4) The court erred by excluding defense evidence of law enforcement agencies' policies and protocols on "active shooters." (5) The court further erred by denying defendant's request to release confidential juror identifying information. (6) The court miscalculated defendant's custody credits.

We reject the first five claims, but defendant's custody credits must be recalculated to add an additional day. The judgment is therefore affirmed as modified.

**FACTS**

Viewed in the light most favorable to the judgment, the evidence presented at trial, including defendant's statements, was as follows. Additional facts relevant to the specific issues defendant raises on appeal are found in the discussion below.

Defendant and Noe Lezama were active participants in the "Orphans," a criminal street gang.[1] One afternoon, along with a few other gang associates, they were "posting up" in an alley claimed by the Orphans as part of their territory. "Posting up" means to "fly[] the colors" in your gang territory, to "hang[] out for a long duration of

---

[1] Although defendant and Lezama were originally charged as codefendants, defendant was tried separately. Lezama's case is not before us.

time . . . just in case you get some rivals or some other people that will drive by and want to tag up [your] neighborhood." It tells anyone who drives by, "I am representing [the] gang," and "this is Orphans' territory."

"Barrio Pobre" is one of Orphans' rival gangs. Barrio Pobre members all knew the alley was "a place that they could find Orphans." That afternoon, Frederick Temple, a Barrio Pobre gang member, appeared at the far end of the alley, wearing a gray sweatshirt and holding a gun. He fired twice at the group of Orphans and ran; no one was hit. Defendant and Lezama jumped into a black sedan, and pursued. Lezama was driving, and defendant was in the front passenger seat.

Meanwhile, Temple ran down another alley, where he took off and discarded his sweatshirt. He then ran onto an adjacent street, where Lezama and defendant soon caught up to him. Lezama stopped the car and defendant, wearing a black T-shirt, got out and put a bandana around his face. He pulled out a gun and fired at least five times at the back of the fleeing Temple, striking him once. Temple was not holding a gun when he was shot. Defendant jumped back in the car, and they drove off. Lezama went back to the alley and dropped off defendant. Defendant told Lezama, "I'll talk to you later. Just don't answer your phone right now. Turn off your phone and take out the battery."

Responding sheriff's deputies gave first aid to Temple, but he died at the scene. A forensic pathologist determined he was killed by a single through-and-through gunshot wound to his upper back, which penetrated his lung and caused him to "ble[e]d out." The fatal bullet was not found. The killing took place about half a mile from the alley.

At the scene, forensic investigators found evidence consistent with multiple shots fired from a nine-millimeter semiautomatic handgun, including five expended shell casings. A .22-caliber revolver wrapped in a gray sweatshirt was recovered in a nearby alley. It was loaded with seven unfired bullets, and had two expended cartridge casings

3

in its chambers. Testing of the revolver indicated it was functional and Temple could not be excluded as the major contributor of DNA found on the gun's grip. No nine-millimeter weapon was found.

The next day, deputies surveilling defendant's house saw a car stop at the residence. The driver went inside and, together with defendant, came out and retrieved a plastic trash bag from the garage. Deputies seized the bag and inside found a black T-shirt and a pair of dark blue shorts. Analysis of the shorts revealed DNA consistent with that of defendant: "[T]he rarity of the [DNA] profile from the shorts [was] more rare than one in one trillion unrelated individuals."

Deputies confirmed Lezama owned a black sedan. In addition, an empty nine-millimeter magazine was found in Lezama's bedroom. Testing of the magazine was inconclusive because there was a mixture of DNA present, precluding meaningful analysis.

Defendant was arrested and interviewed. During the interview, defendant changed his story numerous times and made several denials, including whether he had seen other Orphans that day, whether he was in anyone else's car, and whether he was in the area of the killing. At one point, he attributed the shooting to a gang member named "Midget," someone he later admitted was not even present, and who may not even have ever existed.

He eventually told investigators that he and Lezama had gone to the alley that day. While hanging out there with several other people, he said shots suddenly "came out of nowhere." The gunman took off. He and Lezama ran to Lezama's car to get away, but not to find the shooter. He insisted they had lost sight of the gunman, and never saw him again.

After further questioning, defendant admitted they had "passed through" the area where Temple was shot, stopped for about 15 seconds, but drove away. While stopped, defendant said he was in the front passenger seat, and had opened the car door

4

slightly when he saw Temple run out of the alley. He did not remember why he opened the door, but denied getting out. He did not hear any gunshots while they were there, and insisted they had already left when Temple was killed. He only knew about the shooting because he later heard about it and saw on Facebook there had been a shooting in the area. He admitted he was wearing a black T-shirt and dark blue shorts that day. But when asked about the plastic bag, defendant insisted there was food in it, not clothing.

As for the Orphans, defendant admitted he was part of the "Tiny Locos" clique of the gang. He was "jumped in" the gang when he was 13 years old. He said Orphans was lately having the usual issues with other gangs. Orphans had a longstanding problem with Barrio Pobre, but it was just the usual "crossing each other out," or disrespecting each other by crossing out names. He acknowledged Barrio Pobre had come to the alley in the past, and admitted people sometimes get killed because of the "drama" among gangs.

The parties stipulated that both the Orphans and Barrio Pobre were "criminal street gangs within the meaning of California law." A gang expert testified he was personally familiar with defendant and Lezama, and opined both were active members of the Orphans at the time of the killing. He also explained that, in general, gang members will defend their territory whenever they "post up." In addition, Orphans gang members would have had to retaliate for Temple's shooting at them or the gang would appear weak, and Barrio Pobre and other gangs might then be encouraged to encroach on Orphans' territory. If the Orphans lost territory, they would lose their identity and safe haven.

## DISCUSSION

*1. Defendant's Statements*

Defendant first contends his statements to sheriff's investigators were erroneously admitted because they were obtained in violation of *Miranda.* He does not contest the adequacy of the advisal or his understanding of his rights. Rather, his claim is

5

that, after he was advised, he unequivocally invoked his right to remain silent, and the investigators improperly continued to interrogate him. We disagree.

### A. Background

At the beginning of the interview, investigators read defendant his *Miranda* rights and he confirmed he understood each of them. This exchange then followed:

"[Investigator]: Can we talk about what happened? What I want to talk to talk to you about?

"[Defendant]: Well, like do I have to say I give up my -- my rights or like say I want to speak or?

"[Investigator]: No. Are you willing -- are you willing?

"[Defendant]: Or could I just listen to what you have to say or --

"[Investigator]: No. Are you willing to talk to me about what I'm going to ask you about -- the questions I'm going to ask you?

"[Defendant]: Like I, I guess, like say what you're going to say and I'll listen, like depending -- you know?

"[Investigator]: But you'll answer my questions? Are you willing to answer my questions?

"[Defendant]: Well, I mean, if I say I don't want to or -- what does that do?

"[Investigator]: Basically, what I just read to you is --

"[Defendant]: Yeah.

"[Investigator]: It's called *Miranda* rights. Okay? You said you understood every right.

"[Defendant]: Yes.

"[Investigator]: Okay. I want to talk to you about an incident that occurred, specifically, yesterday. Okay? That's what I want to talk to you about. So, that's what I'm going to be asking you questions about and --

"[Defendant]: Okay.

6

"[Investigator]: So, it's -- you'll talk to me?

"[Defendant]: And I will -- I really got nothing to say about yesterday or anything.

"[Investigator]: You have nothing to say about yesterday or anything? No? If I ask you questions, will you answer them? Or try to answer them?

"[Defendant]: Well, yeah, I mean, yeah, I guess.

"[Investigator]: To the best of your ability?

"[Defendant]: I'll see what -- yeah.

"[Investigator]: Okay. Okay. All right. Tell me what did you do yesterday? Let's start off with that."

The prosecutor played portions of the videotaped interview for the jury before the lunch recess was taken. After the break, the court told counsel it had reviewed some relevant *Miranda* authority over the lunch hour, "just for my own comfort level," even though neither party had brought up any issue. After having looked at *Berghuis v. Thompkins* (2010) 560 U.S. 370 (*Berghuis*), the court told counsel it had concluded defendant did not unambiguously invoke his right to remain silent at the outset of the interview.

Defense counsel did not challenge this informal finding. Instead, counsel noted for the record he too had reviewed defendant's pretrial interview and had also concluded any possible invocation of defendant's *Miranda* right to silence was "equivocal." Furthermore, he specifically told the court he had decided not to move to exclude defendant's statements because of that assessment. As a result, when asked if he had anything to add, the prosecutor merely replied, "Not presently." Neither counsel sought to further litigate the issue, and the court therefore had no need to entertain full briefing and argument, or hold an evidentiary hearing and make a formal ruling.

7

### B. Standard of Review

"'On appeal, we review independently the trial court's legal determinations of whether a defendant's . . . actions constituted an invocation of his [rights]. . . . When 'an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.' [Citation.]" (*People v. Suarez* (2020) 10 Cal.5th 116, 158; cf. *People v. Henderson* (2020) 9 Cal.5th 1013, 1023 (*Henderson*) [applying same standard for invocation of right to counsel].)

### C. Forfeiture

Because defendant did not raise a *Miranda* claim below, he has thereby forfeited the issue on appeal. (*People v. Mattson* (1990) 50 Cal.3d 826, 854 ["'a defendant must make a specific objection on *Miranda* grounds at the trial level in order to raise a *Miranda* claim on appeal'"]; accord, *People v. Rundle* (2008) 43 Cal.4th 76, 116, 121, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 ["absence of specific argument that defendant had invoked his right to silence . . . failed to preserve th[e] claim for appeal"].) Moreover, defendant did not merely fail to object. Rather, his trial counsel affirmatively told the court that, based on his own evaluation of the interview, defendant did not unambiguously invoke his *Miranda* rights. The claim is therefore forfeited. (See *People v. Low* (2010) 49 Cal.4th 372, 392 ["whether defendant's statement should be suppressed under the Fifth Amendment" should not be "decide[d] . . . for the first time in [an appellate] court"].)

### D. The Claim Also Fails on the Merits

Even assuming the issue was not forfeited, it also fails on the merits. "A defendant who has waived his *Miranda* rights may reinvoke them during the interrogation." (*Henderson, supra*, 9 Cal.5th at p. 1022.) "'If [he] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" (*Michigan v. Mosely* (1975) 423 U.S. 96, 100, quoting

*Miranda, supra*, 384 U.S. at pp. 473-474; accord, *Berghuis, supra*, 560 U.S. at pp. 381-382.)

However, only if he "*clearly and unequivocally*" does so must police stop questioning. (*Henderson, supra*, 9 Cal.5th at p. 1022, italics added.) Thus, "'[i]n order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect "must *unambiguously*" assert his right to silence or counsel.'" (*Ibid.*) Such an invocation must be made "with sufficient clarity 'that a reasonable police officer in the circumstances would understand the statement to be'" an invocation; thus, it is "'an objective inquiry.'" (*Ibid.*; accord, *Berghuis, supra*, 560 U.S. at p. 381; cf. *Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*) [same for right to counsel].)

Moreover, "[i]t is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda*, [citation], either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*); accord, *Berghuis, supra*, 560 U.S. at p. 381 and *Davis, supra*, 512 U.S. at pp. 461-462].)

In *Stitely*, the defendant who had waived his *Miranda* rights remarked, "I think it's about time for me to stop talking," and then stated, "Okay," in response to the questioning detective's advisement, "You can stop talking." (*Stitely, supra*, 35 Cal.4th at p. 534, italics omitted.) Upholding admission of the interview at trial, the court held the defendant did not clearly and unambiguously invoke his *Miranda* rights. (*Id.* at p. 536.) "[H]e did not clarify his ambiguous remarks or clearly invoke his constitutional privilege by saying 'Okay.' This nonsubstantive response merely implied that defendant understood what he had just heard, and that he could 'stop talking' if he so chose." (*Ibid.*)

9

Similarly, here defendant responded to the investigator's question whether "you'll talk to me?" with "I will—I really got nothing to say about yesterday *or anything*." (Italics added.) On appeal, defendant myopically focuses on the italicized portion of the sentence, but ignores "I will," and insists this is an unambiguous invocation of his right to remain silent. Not so.

Initially, we note that, following his advisement, defendant proceeded to engage in a conversation with the investigator, asking questions about whether he needed to expressly say he waived his rights, whether he could wait and listen to the questions first, and what would happen if he said he did not want to talk. There was no indication defendant wanted to remain silent. Indeed, he "actively participate[d] in the conversation with the [investigator]—answering questions, asking for clarification, and generally contributing to a discussion he knew was being tape-recorded." (*People v. Parker* (2017) 2 Cal.5th 1184, 1216 (*Parker*).) He asked what would happen *if* he did not want to talk, indicating he had not yet made that decision. Furthermore, there was nothing to suggest the investigators "resorted to physical or psychological pressure to coerce defendant to talk to them." (*Ibid*.)

"[T]he question of ambiguity in an asserted invocation must include a consideration of the communicative aspect of the invocation—what would a *listener* understand to be the defendant's meaning." (*People v. Williams* (2010) 49 Cal.4th 405, 428.) Here, it is reasonable to infer that what defendant meant was that he had nothing to say about "yesterday" or "anything" because he was not involved in any wrongdoing the previous day, and there was nothing to talk about. (See *People v. Martinez* (2010) 47 Cal.4th 911, 949-950 ["'That's all I can tell you,'" reasonably viewed as merely meaning, "'[t]hat's all the information [defendant] had'"]; cf. *Parker, supra*, 2 Cal.5th at pp. 1216-1217 ["'[W]hy would I want to talk to you about something that occurred [in the past]?'" not an invocation; "[t]aken in context, defendant's statement was reasonably understood as seeking to clarify why the [investigators] wished to speak with him"]; *In re Joe R.*

10

(1980) 27 Cal.3d 496, 516 [no invocation when, after some questions, the defendant announced, "'That's all I have to say'"].)

But the whole point is that it was *unclear* what defendant meant by his response, which of course is why it was not an unambiguous invocation. (See *Davis, supra*, 512 U.S. at p. 459 [a statement is ambiguous or equivocal if a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right].) This conclusion is fully consistent with what came next.

Given the underlying ambiguity, the investigator was entitled to attempt to clarify defendant's intent by asking if he would answer his questions. (*People v. Farnam* (2002) 28 Cal.4th 107, 181.) He too was apparently unsure what defendant meant, and so tried to resolve the ambiguity by asking defendant what he meant when he said he had "nothing to say about yesterday," or nothing to say about "anything?" Thus, he rephrased his question more pointedly as: "If I ask you questions, will you answer them? Or try to answer them?" However, instead of indicating any desire to remain silent, defendant said, "Well, yeah, I mean, yeah, I guess." Like the defendant in *Stitely,* defendant "did not clarify his ambiguous remarks or clearly invoke his constitutional privilege . . . ." (*Stiley, supra*, 35 Cal.4th at p. 536.) Rather, when asked if he would answer questions, he simply replied, "[Y]eah, I guess." And because of that affirmative response, the investigator could reasonably have understood defendant had clarified that questioning could proceed. (See *Stitely,* at p. 535.)

Defendant argues that his "body language," as shown in the videotape of the interview, further "intensifie[s]" his allegedly unequivocal refusal to talk. We are unsure whether appellate counsel is trying to testify as an expert on the semiotics of body language, but body language in almost any situation is at best equivocal, and in the context of a police interrogation of a hard-core gang member, probably even more so.[2] In

---

[2] At the time of the killing, defendant was 25 years old. He told investigators he had been jumped into the gang at age 13. In other words, he had been a gang member for

11

any event, even as a court reviewing de novo, we are no more qualified to assess and conclusively determine in the first instance the meaning of a person's body language during an interrogation than any other laypersons, and we decline to do so here. This is especially true when as here the issue was never considered below and has been found forfeited.

More importantly, as the Attorney General aptly points out, defendant's affirmative answers and apparent willingness to answer certain questions actually "caused confusion, even in light of his body language that may have suggested he was saying no." (Cf. *People v. Flores* (2020) 9 Cal.5th 371, 422 ["defendant's '[n]o,' in context, was susceptible of more than one possible interpretation"]; see also *People v. McGreen* (1980) 107 Cal.App.3d 504, 522, disapproved on other grounds in *People v. Wolcott* (1983) 34 Cal.3d 92, 101 [head shake, followed by verbalized "No," unclear in context; permissible for officer to clarify suspect's meaning].) Defendant's "body language" actually exacerbated the ambiguity instead of resolving it.

Finally, defendant refers us to *Henderson*, and contends it "supports [his] overall argument and several subsidiary arguments." We disagree. Although *Henderson* reiterates the applicable standards, it is distinguishable on its facts.

In *Henderson*, during his post-*Miranda* interview with police, the defendant "was reluctant to disclose his whereabouts" on the night of the murder. (*Henderson, supra*, 9 Cal.5th at p. 1020.) After admitting he had been in the same city that night, he was asked if he went to the trailer park where the murder was committed. He replied, "Uhm, there's some things that I, uhm, want uh . . . ." When the question was repeated, he said, "[Want,] uh, *want to speak to an attorney first*, because I, I take responsibility for me, but there's other people" "I need to find out" "I need to find out." (*Ibid.,* italics added.)

_____

almost half his life. The gang expert testified defendant was a "veterano," or seasoned "O.G." (original gangster). Simply put, defendant was no naïf.

12

The court contrasted what the defendant said with earlier cases that had found ambiguity—and therefore no invocation—including: *Davis, supra*, 512 U.S. at p. 462 ("'Maybe I should talk to a lawyer'"); *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219 ("'If you can bring me a lawyer'"); *People v. Bacon* (2010) 50 Cal.4th 1082, 1105 ("'I think it'd probably be a good idea for me to get an attorney'"); and *Stitely, supra,* 35 Cal.4th at p. 535 ("'I think it's about time for me to stop talking'"). (*Henderson, supra*, 9 Cal.5th at p. 1023.) Unlike in those cases, however, the *Henderson* defendant "used no such equivocal language," and clearly said he wanted to talk to a lawyer. (*Ibid.*) Here, defendant's language was far from "clear." *Henderson* does not assist defendant.[3]

Defendant did not unambiguously state he did not want to talk to the investigators. The trial court did not err by admitting defendant's statements.[4]

## 2. *Jury Instructions on Justifiable Homicide*

Defendant next contends the trial court prejudicially erred in the way it instructed the jury regarding one of his justifiable homicide defenses. Assuming, without deciding, the instruction was partially flawed, we find the claim was forfeited and any error was invited.

---

[3] Defendant also relies on *People v. Krebs* (2019) 8 Cal.5th 265, 313, but it too is factually distinguishable. In *Krebs*, after a five-minute break in questioning, the defendant responded to his renewed interrogation by saying, "'Take me back to jail,'" and *twice* exclaimed, "'Nothing to say.'" (*Id.* at. p. 296.) The court found an unambiguous invocation. (*Id.* at p 313.)

[4] Because we find defendant's *Miranda* claim fails on the merits, defendant's corollary claim that his trial counsel was constitutionally ineffective for choosing not to move to suppress defendant's statements necessarily fails. Trial counsel is not ineffective for failing to make unmeritorious objections. (See *People v. Lewis* (1990) 50 Cal.3d 262, 289 [ineffectiveness claim for failing to bring *Miranda*-based suppression motion "fails at the outset since we have already found no merit in defendant's contention that his statements to the police were obtained in violation of *Miranda*"].)

*A. Background*

Defense counsel asked the trial court to instruct with CALCRIM No. 508, "Justifiable Homicide: Citizen Arrest (Non-Peace Officer)." He did not object to or question the validity of this standard instruction when the parties discussed it with the court. As a result, the court gave a version of CALCRIM No. 508, the pertinent part of which read:

"The defendant is not guilty if he killed someone while trying to arrest him for a violent felony. Such a killing is justified, and therefore not unlawful, if: [¶] . . . defendant committed the killing while lawfully *trying to arrest or detain* the decedent for committing a shooting that threatened the defendant or others with death or great bodily injury; [¶] . . . *defendant had reason to believe that the decedent posed a threat of death or great bodily injury, either to the defendant or others*; [and] [¶] . . . [t]he killing was necessary to prevent the . . . decedent's escape. [¶] A person has reason to believe that someone poses a threat of death or great bodily injury or committed the shooting, and that crime threatened the defendant or others with death or great bodily injury when facts known to the person would persuade someone of reasonable caution to have those beliefs." (Italics added.)

In asking for the instruction, counsel focused on the term "detain," and argued there was evidence showing defendant was trying to lawfully detain Temple by shooting and killing him: "Now, [a sheriff's investigator] said my client wouldn't know whether there was a gun hidden under [Temple's] shirt, in the pocket, whatever. Evidence is very clear that the gun was ditched about three-quarters of the way into [Temple's] flight and was obscured from anyone seeing it. [¶] So my client's knowledge at the time would have been that he had deadly force available to *detain this guy or to defend himself*. And I think I think either one of those are legitimate interpretations. [¶] Especially in view of some of the other circumstances -- that or some of the other testimony that, my god, someone said they would expect my client to try and, you know,

14

stop the guy or something like that. [¶] So I think it is an appropriate instruction focusing on the word 'detained.'"[5] (Italics added.)

The court responded that it was already giving self-defense instructions and suggested defense counsel's concerns would be covered in those instructions. Counsel insisted he wanted CALCRIM No. 508 because he intended to "argue both" self-defense *and* citizen's arrest. The prosecutor remarked there was no evidence to suggest defendant "was attempting to effectuate an arrest," but in an effort to avoid creating an "appellate issue about this," agreed the instruction should be given. Defense counsel then expressly accepted the version of the instruction provided by the prosecutor and given by the court.

During his closing argument, defense counsel offered a variety of possible defenses.[6] Germane here, he told the jury that if defendant did shoot Temple, it was justified because he had the right to use deadly force to detain him in a type of citizen's arrest. Intertwined with this defense, he also argued the killing was justifiable because defendant had acted in reasonable self-defense, not knowing that Temple—who was an "active shooter"—had actually discarded his gun and was not then a *current* threat.

On appeal, defendant argues the jury was prejudicially misinstructed on this "citizen's arrest" theory of justifiable homicide because the instruction should not have included the part of CALCRIM No. 508 requiring "defendant had reason to believe that the decedent posed a threat of death or great bodily injury, either to the defendant or

---

[5] While we are not called upon to assess this theory, it is imaginative. But see *People v. Walton* (1982) 136 Cal.App.3d 76, 79 (the defendant's "argument is a creative one, and not entirely devoid of sympathetic appeal. The principles of our legal system do not, however, permit its acceptance" and "[do] not justify his vigilante tactics").

[6] Defendant was not guilty because he was not the killer. Or, he was guilty only of manslaughter, because he shot Temple in the heat of passion, after Temple had just shot at him and his friends, and he was merely defending the people in his neighborhood. Or, he unreasonably believed Temple was going to kill him, and he therefore killed in unreasonable self-defense.

15

others."  He focuses on a temporal ambiguity in the instruction and whether such threat must be on-going *or*, because the word is phrased in the past tense as "posed," it would also include past threats of danger no longer present.  The law is unsettled on this question, and the Bench Notes on the instruction are unhelpful, opining the answer is "unclear," and advising trial courts to "review relevant case law" before giving that part of the instruction.  (CALCRIM No. 508, Bench Notes, ¶ 2.)  But we need not open that door.

### B.  Analysis

We review claims of instructional error de novo.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).)  "A private person may arrest another" for a "public offense committed or attempted in his presence."  (Pen. Code, § 837; undesignated statutory references are to the Penal Code.)  "The person arrested may be subjected to such restraint as is reasonable for his arrest and detention."  (§ 835.)  And a private person may use such reasonable force to effectuate a citizen's arrest.  (*People v. Fosselman* (1983) 33 Cal.3d 572, 579.)  Thus, a "[h]omicide is . . . justifiable when committed by any person" "in attempting, by lawful ways and means, to apprehend any person for any felony committed. . . ."  (§ 197, subd. (4).)

A court has a sua sponte duty to instruct on the defense of justifiable homicide when "'it appears that the defendant is relying on such a defense,'" *or* if "'there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.'"  (*People v. Breverman* (1998) 19 Cal.4th 142, 157, abrogated on another ground by amendments to § 189.)  Here, defense counsel was explicitly relying on a justifiable homicide defense, so the instruction was required.

Defendant insisted on instructing the jury with CALCRIM No. 508 in its entirety—with no objection to or modification of the portion under review here.  As a result, any instructional error claim in this regard is forfeited.  (*Mitchell, supra*, 7 Cal.5th at p. 579, citing *People v. Bolin* (1998) 18 Cal.4th 297, 327.)  Similarly, because he

16

requested the instruction in order to argue how it applied to his citizen's arrest, self-defense, and "active shooter" defenses—a tactical decision—any error was invited. (*People v. Bell* (2019) 7 Cal.5th 70, 109.)

Defendant argues against invited error by insisting that the mere fact "the defense affirmatively acquiesced to the instruction . . . cannot show invited error." However, this mischaracterizes what trial counsel did; this was not a case of *acquiescence* whatsoever, it was a deliberate strategic choice that came after the court indicated it was not inclined to give the instruction at all. Indeed, instead of objecting to the instruction because there was no evidence to support giving it, it was the *prosecutor* who acquiesced, and asked the court to give the instruction so as to avoid any appellate issue.

Defendant changes tack and contends there was no tactical purpose behind trial counsel's request for the instruction, so it cannot be invited error. Again, this is factually inaccurate. In requesting CALCRIM No. 508, counsel told the court he wanted it included because he specifically intended to argue defendant believed Temple was a *continuing* threat to the community as an "active shooter," and he did just that in his closing argument to the jury. Defense counsel wanted the jury to conclude defendant believed Temple posed a continuing threat because he did not know "whether there was a gun hidden under [Temple's] shirt, in the pocket, whatever." The contested part of the instruction was crucial to this argument. And at the same time, it still allowed counsel to be able to argue the evidence was also consistent with an inference defendant was attempting to "detain" Temple in a citizen's arrest by shooting him.

Moreover, when the court opined that these arguments could be made via defendant's self-defense arguments and instructions, counsel understandably insisted he wanted to argue both defenses separately. In other words, defendant's supposed belief Temple was still armed was consistent both with the current danger part of CALCRIM No. 508 *and* his alternate self-defense claim that he and others were in "imminent

17

danger" of being harmed or killed by Temple. Thus, the tactical nature of counsel's request for CALCRIM No. 508 is shown by the fact the portion of the instruction at issue here was not only consistent with, but was *necessary* to his "active shooter" theory.

Because defense counsel made a tactical decision to insist on the instruction in its entirety, including the contested part, the invited error doctrine applies. "Defendant may not now complain that the trial court erroneously gave the instruction he requested." (*People v. Dehoyos* (2013) 57 Cal.4th 79, 139.)[7]

3. *The Prosecutor's Closing Argument*

Defendant next contends the prosecutor committed reversible misconduct in closing argument when he told the jury defendant's gang background showed he was predisposed to commit the offense without any mitigating defenses. Alternatively, he argues his trial counsel was constitutionally ineffective for failing to object to the prosecutor's misstatements and to seek an admonishment. We reject both claims.

A. *Background*

The court instructed with CALCRIM No. 1403, a limiting instruction on gang evidence, which provides: "You may consider evidence of gang activity *only* for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crime and enhancement and special circumstance allegations charged; [¶] OR [¶] The defendant had a motive to commit the crimes charged; [¶] OR [¶] The defendant actually believed in the need to defend himself; [¶] OR [¶] The defendant acted in the heat of passion. [¶] You

---

[7] The invited error doctrine also bars defendant's newly minted constitutional attack on CALCRIM No. 508, and "we need not decide whether the instruction deprived defendant of his constitutional right to present a defense," or to due process. (*People v. Weaver* (2001) 26 Cal.4th 876, 970.) But even were we to consider the claim, "[b]ecause [defendant] *was* allowed to present the defense[s] he chose, followed by jury instructions he agreed to, he was not denied due process by being deprived of the opportunity to present a complete defense" to the jury. (*People v. Rogers* (2006) 39 Cal.4th 826, 872, italics added.)

18

may not consider this evidence for any other purpose. You *may not* conclude from this evidence that the defendant is a person of *bad character* or that he has a *disposition to commit crime*." (Italics added.)

In his closing remarks, the prosecutor argued defendant murdered Temple as revenge for Temple's earlier shooting into the Orphans' gang "turf." He insisted defendant therefore did not kill in the heat of passion, because there was no evidence to suggest he was overcome with emotion: "One notable aspect of heat of passion is that it, of course, involves some type of provocation. But it is not enough that a person is simply provoked. Defendants do not get to set up their own standard of conduct. [¶] What's more, heat of passion requires a killing that involves somebody who was acting rashly, somebody who was overcome by the moment. A person incapable of regaining clear reasoning and judgment." To this point, there was nothing improper in the prosecutor's remarks. (See *People v. Duong* (2020) 10 Cal.5th 36, 64 (*Duong*) [generally, the prosecution is entitled to "'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent'"]; *id.* at p. 65 ["Defendant may have acted in the heat of passion, as the defense argued at trial. But the possibility of other motivations did not preclude the prosecution from presenting evidence that gang affiliation was the precipitating factor"].)

However, the prosecutor then said, "So let me ask you something. Does it seem like this defendant *fits that mold*? Somebody who was wildly overcome with emotion? [¶] This person is a veteran gang member. He got jumped in when he was 13 years old. He is 25, 26 years old and he is still gang-banging. It is not his first day on the job. I don't mean that snidely, it is just he has been around for a very long time. He is not *the type of person* that would be totally shocked by a rival coming into his turf. He has been around too long for that to be the case." (Italics added.)

True or not, these comments did not refer to defendant's motive or intent. Instead they directly referred to his character, based on his long-time gang membership,

19

and implied such a person as defendant would not be the "type of person" disposed to be overcome by a heat of passion. To that extent, they were improper and exceeded the limitations imposed by CALCRIM No. 1403.

Nonetheless, defendant did not object to the prosecutor's argument, or request the court to admonish the jury. Furthermore, the court correctly instructed the jury to follow the court's instructions—including CALCRIM No. 1403—and not the attorneys' description of the law if there was a conflict. We presume the jury followed that instruction. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

### B. Forfeiture

To preserve a claim of prosecutorial misconduct at trial, a defendant must have made a contemporaneous and specific objection in the trial court, and requested an appropriate admonishment to the jury to disregard the improper argument. (*People v. Mendoza* (2016) 62 Cal.4th 856, 905.) "The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm." (*People v. Powell* (2018) 6 Cal.5th 136, 171.) Here, posing an objection, and requesting an admonition, would not have been futile in light of CALCRIM No. 1403's clear directions, and would have cured any harm caused by the prosecutor's misstatements. Defendant's misconduct claim is therefore forfeited.

### C. Even If Preserved, the Prosecutor's Misstatements Were Harmless

"Prosecutorial misbehavior 'violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" (*People v. Rhoades* (2019) 8 Cal.5th 393, 418; *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) "Under state law, a prosecutor's action that does not cause fundamental unfairness is prosecutorial misconduct only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" (*Duong, supra*, 10 Cal.5th at p. 69.)

20

Here, "[t]o the extent the alleged instances of misconduct were not forfeited by defendant's failure to object, we conclude none infected the trial with unfairness or deceived the court or jury." (*People v. Hoyt* (2020) 8 Cal.5th 892, 943 (*Hoyt*).) Furthermore, defendant makes no claim the jury was misinstructed on this point, and does not refer us to anything concrete in the record indicating the jury understood or applied the prosecutor's statements in any improper or erroneous manner. Thus, there was no prejudicial misconduct under either federal or state law.

Moreover, "[w]hen attacking the prosecutor's remarks to the jury, the defendant must *show* that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*), italics added.)

Defendant speculates that "[the] improper gang-character argument *may have* (and indeed probably) tipped the balance in light of the well-recognized powerful effect of character and propensity evidence." (Italics added.) This conjecture ignores the fact the court specifically instructed the jury it was not to consider the evidence for such purposes, and that it should disregard anything the attorneys said that was inconsistent.

Speculation aside, "we presume that the jury relied on the instructions, not the arguments, in convicting defendant. '[I]t should be noted that the jury, of course, could totally disregard *all* the arguments of counsel.' [Citation.] Though we have focused on the prosecutor's closing arguments, we do not do so at the expense of our presumption that 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.] The trial court emphasized this rule when, as stated, it instructed the jury to follow its instructions and to exalt them over the parties' arguments and statements."

21

(*People v, Morales* (2001) 25 Cal.4th 34, 47 (*Morales*); see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 447 ["As we have consistently stated in numerous contexts we generally presume that jurors are capable of following, and do follow, the trial court's instructions"].) That is what happened here.

Before closing arguments began, the trial court preinstructed the jury. The instructions included CALCRIM Nos. 200 and 222, which told the jury it was to base its decision only on the evidence presented, that the attorneys' arguments were not evidence, and that the jury must follow the law as stated by the court, even if the attorneys' comments conflicted with the court's instructions. Most significant was CALCRIM No. 1403, of course, because it specifically told the jury how it could and could not use gang evidence admitted for limited purposes.

Nothing in the record suggests a "reasonable likelihood that the jury construed or applied" the prosecutor's remarks "in an objectionable fashion." (*Morales, supra*, 25 Cal.4th at p. 44.) The record is devoid of any evidence to suggest defendant's reaction to Temple's intrusion into Orphans territory was anything other than an act of coldly calculated retribution. Therefore, even if not forfeited by defendant's failure to object, the prosecutor's misuse of defendant's gang background in his closing argument was harmless. (See *Hoyt, supra*, 8 Cal.5th at p. 943.)

### D. Ineffectiveness of Counsel

"An ineffective assistance claim has two components: A [defendant] must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 (*Wiggins*); *Strickland v. Washington* (1984) 466 U.S. 668, 687-696 (*Strickland*).) Both are "mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073 (*Gay*).)

"There are countless ways to provide effective assistance [and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way."

22

(*Strickland, supra*, 466 U.S. at p. 689.) And "[t]o establish deficient performance, a [defendant] must *demonstrate* that counsel's representation 'fell below an objective standard of reasonableness,'" as measured by "'prevailing professional norms.'" (*Wiggins*, *supra*, 539 U.S. at p. 521, italics added.) "When applying this standard, we ask whether any reasonably competent counsel would have done as counsel did. . . . Judicial review of counsel's performance is deferential; to establish deficient performance, the defendant 'must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."'" (*Gay, supra*, 8 Cal.5th at p. 1073.)

Defendant's "burden in this regard 'is difficult to carry' in this case, because this is a direct appeal and the record does not disclose the reason for counsel's failure to object. [Citation.] For those reasons, 'we may reverse "*only* if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711, italics added.)[8] "This rule 'is particularly apt' where, as here, 'the asserted deficiency arises from defense counsel's failure to object. "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance."'" (*Ibid.*; see *Centeno, supra*, 60 Cal.4th at p. 675 ["'a mere failure to object to evidence or argument seldom establishes counsel's incompetence'"].) This is not one of those rare cases.

Defendant has failed to carry his burden because counsel was not asked why he failed to object, the record does not affirmatively disclose that counsel had no rational tactical purpose for not objecting, and we are not convinced there could be no

---

[8] "'All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.'" (*Hoyt, supra*, 8 Cal.5th at p. 958; see *People v. Mayfield* (1993) 5 Cal.4th 142, 188 ["tactical choices presented to us on a silent record . . . are better evaluated by way of a petition for writ of habeas corpus, and on direct appeal we reject them"].)

satisfactory explanation. The prosecutor's remarks were brief and only marginally improper; the remainder of his gang-related arguments were fair comments on the evidence. The gang evidence was primarily used for proper purposes, and the trial court's instructions correctly cautioned the jury as to the limited purpose for which that evidence could be considered. Trial counsel need not object to *everything* in order to be effective; when to object is often more important than how many times counsel objects.

More importantly, because the prosecutor's remarks were harmless, counsel's failure to object to them could not have affected the outcome of the proceedings. In other words, even assuming counsel's performance fell below prevailing professional standards—of which defendant has provided no showing whatsoever—there was no resulting prejudice.

*4. Defense Evidence of Law Enforcement "Active Shooter" Policies and Protocols*

Defendant next contends the trial court erred when it excluded as irrelevant his proffered evidence of certain law enforcement agencies' policies and protocols on "active shooters" that had allegedly been publicized for the general population. The court did not err.

*A. Background*

Defense counsel sought to admit various materials from law enforcement agencies relating to "active shooters," and to use them to cross-examine the prosecution's witnesses, including the gang expert. Relying on documents purportedly from the Department of Homeland Security prepared for private citizens, the Orange County Sheriff's Department's policies and programs, and related statutes, counsel initially argued he should be allowed to ask the gang expert whether defendant acted like "a private citizen is taught to act" in situations involving "active shooters." Similarly, he suggested defendant reacted to Temple's shooting at the group in "the same way law

24

enforcement would." Finally, counsel argued this evidence was relevant to whether defendant's killing Temple was for the benefit of the gang.[9]

The prosecutor objected to the proposed cross-examination of prosecution witnesses on relevance grounds, noting specifically that the prosecution witnesses may or may not have even known about these law enforcement agency policies. He also argued that whether Temple was a "shooter" was undisputed and already in evidence. In addition, citing Evidence Code section 352, the prosecutor argued that suggesting Temple was an "active shooter" in the suggested manner—"some madman who goes into an elementary school around the corner or a synagogue down the street"—would confuse the jury at best and be prejudicial at worst.

The trial court denied the defense's request to cross-examine the prosecution witnesses with the proffered documents on relevance grounds. However, as to the gang expert, the court allowed the defense to ask about defendant's possible reasons for pursuing Temple. Counsel would also be permitted to ask the expert whether Temple was considered an "active shooter" and, on cross-examination, the expert did admit Temple was indeed an "active shooter."

In closing argument, defense counsel told the jury that Temple was a "terrorist active shooter," and the "government" had acknowledged there was "active terrorism happening in Stanton." He went on by saying, "It was happening in Thousand Oaks where people were killed. It is happening in civilian places, sure. Is it just schools or houses? Schools and churches?" Tying it into the present case, he argued, "Five of [defendant's] friends almost get killed. He could have offered to stay back. He doesn't. He does a thing I don't know if I could do. He goes after the guy. Are you looking at a

---

[9] Defense counsel stated he would call an unidentified "former deputy of gang training who will testify about active shooter[s]," but he never actually attempted to do so, despite the prosecutor and the trial court's willingness to hold a hearing with such a witness.

25

killer?  Or are you looking at a brave young man?  What does it take to do what he did?  [¶] I wish this hadn't happened to him so much.  You know why?  I wish he was defending our country.  You know why?  Because when they shoot at us, he will shoot back.  He would protect our country."

Defendant now contends the exclusion of his supporting "documents" and "materials" was an abuse of discretion and therefore reversible error.  We are not persuaded.

### B.  Standard of Review

"'A trial court has "considerable discretion" in determining the relevance of evidence.'"  (*People v. Jones* (2017) 3 Cal.5th 583, 609.)  We therefore review a trial court's relevance rulings for an abuse of that discretion.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1073.)

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice . . . ."  (Evid. Code, § 354; see also Cal. Const., art. VI, § 13 [no judgment shall be set aside on the ground of the improper rejection of evidence unless the error complained of has resulted in a miscarriage of justice].)  "'[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'  [Citations.]"  (*People v. Richardson* (2008) 43 Cal.4th 959, 1001; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [where ruling was not a refusal to allow the defendant to present a defense, but merely rejected certain evidence concerning the defense, review is under *People v. Watson* (1956) 46 Cal.2d 818, 836].)

26

*C. Analysis*

The court found the active shooter materials irrelevant because there was no evidence defendant was even aware of them, let alone that he acted on them. Even defendant appears to agree with this foundational necessity in his opening brief: "*If* [defendant] *knew* that this was the Government's advice, the relevance was evident." (First italics added.) However, there is no evidence defendant knew anything about this "advice."

Only relevant evidence is admissible. (Evid. Code, § 350.) As the proponent of the proffered documents, defendant had the burden of showing they were relevant, probative, and otherwise admissible. (Evid. Code, §§ 350, 352, 400, 401, 403.) "'When the relevance of proffered evidence depends on the existence of a disputed material fact or facts, the proponent of that evidence bears the burden of establishing all preliminary facts pertinent to the question of relevance. [Citations.] The disputed evidence is inadmissible unless the court finds evidence sufficient to sustain a finding that those pertinent preliminary facts exist." (*People v. Melendez* (2016) 2 Cal.5th 1, 23, citing Evid. Code, § 403.) Thus, defendant had the burden of proving he was aware of the proffered "active shooter" policies and procedures.[10] (Cf. *People v. Alexander* (2010) 49 Cal.4th 846, 904 [describing relevancy as a "threshold requirement"].) Here, he failed to do so and, as a result, failed to establish the preliminary facts necessary to make the evidence relevant. (See *People v. Morrison* (2004) 34 Cal.4th 698, 724 (*Morrison*).)

Defendant attempts to avoid this foundational deficit by citing a bevy of inapt federal decisions regarding drawing inferences from circumstantial evidence, and arguing that *a jury* could "infer a party's knowledge of the [active shooter materials] from the very fact that [they were] widely disseminated." First, this argument confuses the

---

[10] Because we find defendant failed to establish relevance at this first step, we need not further decide whether he was similarly required to prove he actually acted in accordance with this purported "advice" to the citizenry.

27

proper focus of the inquiry; juries do not determine relevance, trial judges do. Second, it begs the question because defendant's cited authority has nothing to do with threshold determinations of relevance under Evidence Code section 403, and instead involves evidentiary inferences that can be drawn from otherwise admissible circumstantial evidence, or factual situations so different from the case before us as to be meaningless here.

The dispositive fact is that defendant proffered *no* evidence—not merely insufficient evidence—to even remotely suggest he was aware of any "active shooter" advice purportedly issued by law enforcement. While defense counsel was permitted to argue to the jury his rather novel theory of defendant as the noble but flawed anti-hero, pursuing vigilante justice when his neighborhood was threatened by Barrio Pobre, he was unable to bolster it with evidence his actions were in part based on his reliance on law enforcement's general advisories to the public about "active shooters." In the end, counsel was unable to establish a sufficient foundation to show an actual connection between that purported advice and defendant, and therefore the trial court did not abuse its discretion in finding the proffered evidence irrelevant.

### D. Constitutional Error

Defendant also claims the court's exclusion of the proffered active shooter evidence violated his federal constitutional rights to a fair trial, due process, and to present a defense. First, this constitutional argument is forfeited because it was not raised in the trial court. (Cf. *People v. Clark* (2016) 63 Cal.4th 522, 584 ["Because defendant never raised this argument below . . . he has forfeited this argument"]; see also *People v. Daniels* (2009) 176 Cal.App.4th 304, 320, fn. 10 [an "appellate contention that the erroneous exclusion of evidence violated a constitutional right is not preserved [without] an objection on that ground below"].) Moreover, because we have concluded the trial court did not err in its evidentiary ruling, defendant's newly applied constitutional gloss to his state law evidentiary claim should be summarily rejected and no "separate

28

constitutional discussion is required." (*People v. Nelson* (2016) 1 Cal.5th 513, 534; *People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3 [finding that because there was no error in excluding evidence, the constitutional claims also necessarily fail]; *People v. Wallace* (2008) 44 Cal.4th 1032, 1050, fn. 4 [rejection of a claim on its merits necessarily disposes of any additional constitutional "gloss"].)

But even were we to address the merits of his constitutional claim, it would still fail. "'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.'" (*People v. Blacksher* (2011) 52 Cal.4th 769, 821; see *People v. Hovarter* (2008) 44 Cal.4th 983, 1010 [the "routine application of state evidentiary law does not implicate [a] defendant's constitutional rights'"]; *Morrison, supra*, 34 Cal.4th at p. 724 ["the United States Supreme Court has never suggested that states are without power to formulate and apply reasonable foundational requirements for the admission of evidence"].) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.'" [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 443.) Here, neither defendant's citizen's arrest or self-defense arguments were curtailed by the court's ruling. Furthermore, as discussed, his "active shooter" documents were at best merely speculative because counsel could not tie them to any

evidence defendant was either aware of them or acted based on them. Their exclusion did not abridge defendant's rights to present his defense.[11]

*5. Release of Confidential Juror Information*

Defendant's penultimate contention is that the judgment must be conditionally reversed, and the matter remanded, because the trial court erred by denying his motion to release the jurors' confidential identifying information. We once more disagree.

*A. Background*

Before sentencing, defendant filed an application for the release of confidential juror identifying information under Code of Civil Procedure section 237. He alleged there was juror misconduct based on his trial counsel's conversation with the jury foreperson after the verdicts. He requested the personal identifying information of "all the jurors," based on a suspicion the foreperson, and "*possibly* two other jurors," might have committed misconduct. (Italics added.)

Counsel said the foreperson had told him that, if he had been defendant, he "would have also protected his neighborhood . . . in the same way that [defendant] had acted." He said he and two other jurors had tried to convince the other jurors "in the same manner." The foreperson told counsel that "when the jur[y] had recessed at the end

---

[11] Defendant tosses in a "cumulative prejudice" argument in a subheading at the end of his discussion of the proffered but irrelevant "active shooter" evidence. It too is meritless. The "'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.'" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) Thus, "[a] predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Here, there is no cumulative effect of multiple errors, the only situation in which the cumulative error doctrine applies. (*People v. Williams* (2013) 56 Cal.4th 165, 201, abrogated on other grounds in *People v. Elizalde* (2015) 61 Cal.4th 523.) If a reviewing court rejects all of a defendant's claims of error, it should also reject a contention of cumulative error. (*People v. Lopez* (2018) 5 Cal.5th 339, 371.) Because we have rejected all but one of defendant's individual claims of error—or found them forfeited or harmless—there are no multiple errors to cumulate. Defendant received the process he was due and a fair trial.

of the [second day of deliberations], the jury seemed to be in agreement that [defendant] was guilty of [s]econd [d]egree [m]urder." However, "overnight another juror had 'done his homework'" and "started illustrating on 'the board' as to why [defendant] was guilty of first degree murder." "The jury eventually decided on the verdict as rendered." The foreperson told counsel he felt "very bad" and had "tried to save [defendant]" but he could not do it.

Defense counsel argued this showed the foreperson and possibly two other jurors voted guilty on first degree murder despite harboring a reasonable doubt as to his guilt, and simply went along with other jurors without making an individual decision, all of which violated his constitutional rights.

The trial court found no good cause to release the information, and denied the application. The court explained there was nothing in counsel's declaration to show any of the jurors were forced or bullied into reaching a first degree murder verdict. Acknowledging that the foreperson appeared "emotional" when the jury was individually polled, the court noted that, when polled, he responded "without hesitation" that the guilty verdict of first degree murder "was his true and correct verdict." "Feeling emotional about a verdict is not good cause," the court added. "There was no doubt that the decision to find the defendant guilty of first degree murder was a difficult one for the foreperson, but that doesn't amount to good cause. There was no jury misconduct."

B. *Legal Background*

A trial court has "broad discretion" in ruling on a motion for jurors' identifying information, and we therefore review the court's order denying defendant's disclosure request under a deferential abuse of discretion standard. (Cf. *People v. Avila* (2006) 38 Cal.4th 491, 604 (*Avila*); *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1096-1097 (*Townsel*).)

After the verdict in a criminal case, the record of personal identifying information of the trial jurors is sealed. (Code Civ. Proc., § 237, subd. (a)(2).) A

criminal defendant may petition for access to this information—names, addresses and telephone numbers—when the sealed information is "necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g); *People v. McNally* (2015) 236 Cal.App.4th 1419, 1430 (*McNally*).) Such "petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." (Code Civ. Proc., § 237, subd. (b); *McNally,* at p. 1430.) "Absent a showing of good cause for the release of the information, the public interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure." (*McNally,* at p. 1430.)

To demonstrate good cause, a defendant must make a sufficient showing "'to support a reasonable belief that jury misconduct occurred.'" (*People v. Jones* (1998) 17 Cal.4th 279, 317 (*Jones*); *People v. Cook* (2015) 236 Cal.App.4th 341, 345-346 (*Cook*).) Moreover, the alleged misconduct must be "'of such a character as is likely to have influenced the verdict improperly.'" (*People v. Jefflo* (1998) 63 Cal.App.4th 1314, 1322 (*Jefflo*), quoting Evid. Code, § 1150, subd. (a).) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Cook* at p. 346; *Jefflo* at p. 1322 [same].) Requests for the release of confidential juror records "'should not be used as a "fishing expedition" to search for possible misconduct,'" and any further evidentiary hearing "'should be held only when the defense has come forward with evidence demonstrating a *strong possibility* that prejudicial misconduct has occurred.'" (*Avila, supra*, 38 Cal.4th at p. 604, italics added.)

In addition, there are limits on the type of evidence that may be used to make the prima facie showing of good cause. "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is*

32

*admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.*" (Evid. Code, § 1150, subd. (a), italics added.) Therefore, neither we nor the trial court may consider *why* the foreperson was "emotional," what verdict he, or any other juror, was "leaning toward," what they were "thinking," what they "wrestled with" or why, or what they "had a hard time with." (See *People v. Johnson* (2013) 222 Cal.App.4th 486, 495.) Nor may a court consider the *reasons* the jurors ultimately voted for first degree murder. (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419 ["when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes" and "[c]onsideration of such a statement as evidence of those processes is barred"].)

### C. Analysis

As noted, speculation on how the jury arrived at its verdict does not establish good cause for release of juror identifying information. (*Jefflo, supra*, 63 Cal.App.4th at p. 1322.) Moreover, to demonstrate good cause, a defendant must make a sufficient showing "'to support a reasonable belief that jury misconduct occurred.'" (*Jones, supra*, 17 Cal.4th at p. 317.) Trial counsel's declaration failed to make that showing. Rather, the whole purpose of defendant's request for disclosure of the jurors' personal information was to identify and contact the foreperson, and "possibly" two other jurors, to *look* for evidence of jury misconduct. Contrary to defendant's argument, this was an impermissible "''fishing expedition" to search for possible misconduct.'" (*Avila, supra*, 38 Cal.4th at p. 604.)

The court found: "There is nothing in [defense counsel's] declaration that supports a showing of juror misconduct. All that the foreperson states was that the foreperson and possibly two other jurors argued against first degree murder. [¶] There is nothing in the declaration that indicates the foreperson or anyone else was bullied or forced to reach a verdict on first degree murder. The conduct in the declaration appears

33

to be the typical deliberations that occur. Feeling emotional about a verdict is not good cause. [¶] The jurors were asked by the clerk as a group if the verdicts and findings were their true and correct verdicts and findings. [They] responded yes. Once again, the foreperson was individually polled by the court. And he was emotional, but responded without hesitation that it was his true and correct verdict. [¶] There was no doubt that the decision to find the defendant guilty of first degree murder was a difficult one for the foreperson, but that doesn't amount to good cause. There was no jury misconduct." We agree.

Under these circumstances, the trial court could well conclude defendant had not made a sufficient showing "'to support a *reasonable* belief that jury misconduct occurred.'" (*Jones, supra*, 17 Cal.4th at p. 317, italics added.) We cannot say the trial court's findings in this regard were an abuse of discretion and deny defendant's request to remand the matter.[12]

*6. Custody Credits*

Lastly, defendant correctly points out the trial court erred by awarding him only 821 days of custody credits at sentencing. Defendant was arrested on March 1, 2017, and was sentenced on May 31, 2019. "Calculation of custody credit begins on the day of arrest and continues through the day of sentencing." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; see § 2900.5.) In contrast to the usual rules for computing time,[13] the day of arrest is day 1, not day 0. Defendant was in actual custody

---

[12] Defendant also claims the denial of his access to juror information violated a host of his constitutional rights. Absent a good cause showing of jury misconduct, however, a defendant has no fundamental right to access confidential juror identifying information after trial. (*Townsel, supra*, 20 Cal.4th at p. 1092.)

[13] "The time in which any act provided by law is to be done is computed by excluding the first day, and including the last, unless the last day is a holiday, and then it is also excluded." (Code Civ. Proc., § 12; Civ. Code, § 10; Gov. Code, § 6800.)

for 822 days, and is entitled to one additional day of credits. We may modify a judgment to correct custody credits, and we do so here. (See § 1260.)

## DISPOSITION

The judgment is modified to reflect defendant is entitled to one additional day of custody credits. Upon issuance of the remittitur, the trial court is directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


IKOLA, J.