Filed 6/18/21  P. v. Maravilla CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074806 |
| v. | (Super.Ct.No. FVI17000747) |
| WALTER ALFONSO GONZALEZ MARAVILLA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Debra Harris, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Walter Alfonso Gonzalez Maravilla beat up his ex-girlfriend at Hook Park in Victorville in front of several witnesses. After beating her for 20 minutes, he dragged her to the front of the car, placed her head in front of the tire, and twice ran over her head. She died instantly.

Defendant was found guilty of willful, premeditated and deliberate first degree murder (Pen. Code, § 187, subd. (a))[1] and the jury found true the special allegation that he used a dangerous and deadly weapon during the commission of the crime (§ 12022, subd. (b)(1)). Defendant was sentenced to 26 years to life to be served in state prison.

Defendant makes one claim on appeal that his pretrial statement to police should have been excluded because he exercised his *Miranda*[2] right to remain silent, and the subsequent interrogation violated his Fifth and Fourteenth Amendment rights under the United States Constitution.

## FACTUAL BACKGROUND

A.     TEJADA'S MURDER

Alexandria Whitaker went to Hook Park in Victorville on March 15, 2017, at approximately 6:30 p.m., with her friend and their children. At around 8:25 p.m., they were in a grassy area in the park. She observed a white car speed into the parking lot and stop. There were street lights illuminating the parking lot. There was a man in the driver's seat, who she identified as defendant, and a female passenger, who was later

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

identified as Rose Tejada. Whitaker did not know them. Defendant got out of the car and walked over to the passenger's side. Defendant pulled Tejada out of the car. Whitaker and her friend gathered their children; they all got into their car but remained in the parking lot.

Defendant punched Tejada as he pulled her from the white car. He pulled her out and she fell on the ground outside the car. Defendant dragged her to the front of the car. Whitaker could no longer see Tejada but could hear her screaming. Whitaker could see defendant leaning over Tejada. Defendant was punching Tejada while she was on the ground. Whitaker called the police. The call was made at 8:27 p.m. She advised the dispatcher that a man was beating up his girlfriend at Hook Park and she was rendered unconscious. Whitaker then stated, "He's stomping her. Oh my fucking gosh. Oh my God. Oh my God." She described the car as white and that defendant was dragging Tejada again. Whitaker then exclaimed, "I think he's about to run her over. Oh my God, he ran over her. Oh my fucking God." Whitaker reported that defendant ran over Tejada a second time. Defendant walked into the park after he ran her over. He then walked back to Tejada. He stomped on Tejada's face and kicked her. Defendant got back in the car and started driving.

At some point during the incident, Whitaker was able to see Tejada and it appeared that she was having some type of seizure. It appeared that defendant pulled Tejada to the front of the car and lined up her head with the front tire. When he ran over Tejada the first time, he was driving approximately five miles an hour. He drove in a circle and returned back. The second time he ran over her, he was driving 25 miles per

3

hour. Defendant was in the car when the police arrived. He sat in the car for some time while the police had their weapons drawn but he eventually exited the car.

Whitaker estimated that defendant beat up Tejada for 20 minutes but it could have been a shorter time. At some point Tejada was unconscious but defendant kept punching and kicking her. Tejada was making no movements or sounds when defendant dragged her in front of the car before he ran her over.

Austin Bell was also at Hook Park that evening. He was sitting in his car listening to music. As he was listening to music, he heard a female scream. He turned to see a male and a female by a white car. Bell observed the male hit the female with his fist. Bell estimated the male hit the female approximately 40 times. The female fell to the ground and the male started hitting her with both fists. He kicked her. She stopped screaming and seemed like she was unconscious. The male dragged the female to the front of the car and then ran over her. The man turned around and ran over her again, driving faster the second time. Bell heard sirens.[3] Defendant got in the car and started driving but was stopped by the arriving officers.

San Bernardino County Sheriff's Deputy Chris Dekeyrel was dispatched to Hook Park on March 15, 2017, at approximately 8:32 p.m. He pulled into the parking lot at Hook Park. Another sheriff's deputy pulled into the parking lot at the same time. A white car was driving slowly in the parking lot. The car did not have its lights on and there was blood on the driver's side rear door. Deputy Dekeyrel exited his vehicle and

_____

[3] Bell had tried to call the police but could not get through.

4

drew his weapon. Defendant was in the driver's seat and exited the car. Defendant had blood on his face and on his clothing.

Deputy Dekeyrel found Tejada lying on the ground. She was lying on her back staring straight ahead and was not responsive. Paramedics were called and pronounced Tejada dead at 8:38 p.m.

San Bernardino Police Sergeant Troy Mooradian was assigned to investigate the death of Tejada. Tire tread tracks with blood were found in the parking lot. A hoop earring with blood on it was found on the ground. Blood stains were found on a curb. Blood smear was found in the parking lot, which appeared to be caused by the victim being dragged. Tejada had significant blood on her hand and arm. She had tire marks on her abdomen. The tire marks on Tejada's abdomen were consistent with the tread on the white car. There was blood on the tires. The rear bumper of the car and the bottom of the car had blood droplets. A purse was found inside the white car.

An autopsy was performed on Tejada on March 21, 2017. Tejada had lacerations, bruising and scrapes on her face. She was missing several teeth. Skin on her scalp had been ripped off exposing the underlying bone. The injury was consistent with being run over by a car. Her right ear had been almost torn off. The injuries to her face were consistent with both blunt force trauma and also consistent with someone being hit by a car. She had fractures of the jaw bone and her nose. Her neck was broken.

Tejada also had broken ribs both in the front of her chest and in the back. It was difficult to break the ribs in a person's back. It was not consistent with being punched. She had black marks on her abdomen that went up to her chest. Her liver was torn. Her

5

injuries were sustained before she died. She died from the multiple blunt force injuries. The injuries to her neck could have been caused by someone stomping on her neck while she was lying on the ground. However, the scalp injury would not be caused by stomping on her head.

### B.     DEFENDANT'S INTERVIEW

San Bernardino County Sheriff's Sergeant Claus Hartleben interviewed defendant with Detective Adam Salsberry. Hartleben spoke both English and Spanish. The interview was in both English and Spanish.[4]

Sergeant Hartleben read defendant his *Miranda* rights and then began the booking process. Defendant informed Hartleben he did not want to go to jail. Hartleben told defendant, " 'Well, we wanna know what happened.' " Defendant responded, " 'Well, I committed it, but—' " Hartleben told him he did not understand and defendant responded, " 'Well, I did everything.' " Hartleben told defendant to tell him what had happened. Defendant told him that he and Tejada had problems. Defendant indicated that he and Tejada had been a couple for over two years but were no longer together at the time of the incident.

---

[4] The substance of defendant's interview was introduced through the testimony of Sergeant Hartleben. The jury was given the video of the interview but without sound based on it being in both English and Spanish. We have reviewed the video. The transcript of the interview is included in the clerk's transcript but was not given to the jury.

Defendant and Tejada got together that day to talk. Tejada had picked him up and they had driven to Hook Park. Tejada accused him of stealing money from her. He denied that he stole the money. Sergeant Hartleben asked defendant if he got angry with Tejada. Defendant started "chuckling." Defendant told him that when he and Tejada were together they had a lot of problems and he was "heated up" that day. Defendant said, "[I]t was her or me, one or the other." Tejada wanted to get back together with him but he did not want to be with her. Defendant got angry and hit Tejada in the face.

When Sergeant Hartleben asked defendant if he hit Tejada he chuckled again. Hartleben asked defendant how many times he hit Tejada. Defendant responded, " 'Until I killed her, no? I think.' " Defendant admitted that he was still hitting her when he thought she was dead. Hartleben asked defendant what he did with the car. He "chuckle[d]" and responded, " 'I ran her over.' " Hartleben asked defendant why he ran over Tejada if he thought she was already dead, and he responded, " 'She owed me' " because of all of their problems during their relationship. When asked if he felt bad, defendant said no and that he just wanted to see a doctor. His hand had been injured. Defendant indicated he got mad at Tejada because she was saying "lots of things" to him and he did not want to listen. She was insulting him and he could no longer take it. He admitted running her over twice. He had dragged her in front of the car so he could run her over. He ran over her face.

Sergeant Hartleben did not ask defendant why he was laughing at times during the interview. Hartleben admitted defendant could have just been nervous. The parties stipulated that the jury could review the video.

## DISCUSSION

Defendant claims the trial court erred by admitting his pretrial statement as he had invoked his *Miranda* rights; the interrogating officers did not honor his invocation of that right by continuing questioning. The admission of his statement was not harmless beyond a reasonable doubt.

A.      ADDITIONAL FACTUAL HISTORY

Prior to trial, an Evidence Code section 402 hearing was held regarding the admission of defendant's pretrial statement. Sergeant Hartleben was a certified Spanish speaker with the sheriff's department. He grew up speaking Spanish. A transcript of the interview, which was in both English and Spanish (Exhibit 1) was provided to the trial court. The interview took place at the Victorville Sheriff's Station. The room was a five-by-five room with a table and three chairs. Detective Salsberry sat in the corner and Hartleben sat across the table from defendant. The door was unobstructed but closed. Both officers were in plainclothes, had badges and firearms.

Sergeant Hartleben and Detective Salsberry first talked to defendant about his family and where he was born. Hartleben talked to defendant in English and Spanish. He read defendant his *Miranda* rights in Spanish. Defendant stated that he understood his rights. Hartleben then asked defendant, "Are you willing to answer some questions?" Defendant responded, "Yeah." Defendant was then read his *Miranda* rights in English. Hartleben again asked defendant if he wanted to speak with him. Defendant responded, "No, about what?" Hartleben told him about what had happened that day. Defendant responded, "I don't know." Hartleben asked, "[D]o you want to talk or no—" Defendant

8

responded, "Nah." Defendant told him, "[W]ell, that if I don't want to talk, that's fine." Hartleben advised defendant since he did not want to talk that they were going to book him into jail. Detective Salsberry told defendant he could use the restroom if he needed.

They took a break and Sergeant Hartleben and Detective Salsberry left the room. Hartleben testified from the time they left the room until the time they came back to the room to start the booking process was approximately 35 minutes. They returned to the interview room and started the booking process. Hartleben did not recall giving defendant his *Miranda* rights a second time. Hartleben told defendant that since he did not want to talk, they had to continue with the booking process. Hartleben asked if everything was good with defendant. Defendant was asked his name and for his emergency contact. Defendant claimed he had no one. Hartleben then told him that he was being booked for killing someone. Hartleben asked him how to say murder in Spanish and they discussed it. He told defendant that murder was a felony. Hartleben then asked defendant if he had any questions, and defendant responded that he did not want to go to jail. Hartleben told him, "Its why we're here. We want to know what happened." Defendant then told him "Well. . . . I committed it, but."

Sergeant Hartleben asked, "What do you mean you committed? I don't understand" and defendant responded, "I did everything." They then continued with the interview. The full interview followed this statement as set forth, *ante*.

The trial court noted the issue was whether defendant initiated the conversation, which led to the statements. Also relevant was the amount of time between the *Miranda* warnings and the reinitiation. The trial court ruled that defendant did invoke his *Miranda*

9

rights and the People had the burden of proving that defendant reinitiated the conversation with an understanding of his right to remain silent.

The trial court found the issue was whether Sergeant Hartleben's question "We want to know what happened" was equivalent to interrogation. The trial court found that defendant was well aware of his right to remain silent. There was no prolonged delay between his exercising his right to remain silent and making his statement. Hartleben asking if defendant had any questions was in reference to the booking process. The trial court ruled, "So I find that *Miranda* was not violated. The defendant did initiate the conversation, and his willingness to cooperate and to make statements was with his rights in mind, specifically, his right to remain silent."

B.     ADMISSION OF DEFENDANT'S STATEMENT

"The governing principles are well established. Before subjecting suspects to custodial interrogation, the police must inform them of their *Miranda* rights and obtain a waiver that is knowing, voluntary, and intelligent. [Citation.] The test for validity is as follows. 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.' [Citation.] The prosecution must

10

demonstrate the validity of a suspect's waiver by a preponderance of the evidence." (*People v. Molano* (2019) 7 Cal.5th 620, 648, fn. omitted.)

"A defendant who has waived his *Miranda* rights may reinvoke them during the interrogation. If he clearly and unequivocally does so, police must stop questioning. [Citation.] Once a suspect has invoked his right to counsel, police may not resume questioning until counsel is provided or the suspect himself reinitiates contact. [*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485] '*Edwards* set forth a "bright-line rule" that *all* questioning must cease after an accused requests counsel. [Citation.] In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"— explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1022.) Such request for counsel equally applies to the decision to remain silent. (*In re Z.A.* (2012) 207 Cal.App.4th 1401, 1417; see also *Berghuis v. Thompkins* (2010) 560 U.S. 370, 381 ["there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel"].) "An accused 'initiates' " further communication, when his words or conduct "can be 'fairly said to represent a desire' on his part 'to open up a more generalized discussion relating directly or indirectly to the investigation.' " (*People v. Mickey* (1991) 54 Cal.3d 612, 648.) We review the findings of the trial court for substantial evidence. (*Id.* at p. 649; see also *People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.)

In *People v. McCurdy*, *supra*, 59 Cal.4th 1063, the defendant was advised of his *Miranda* rights and waived them. During the interrogation, the defendant stated that he wanted a lawyer. The deputy sheriff who was interrogating the defendant started to close his file and leave the room. "Around 20 seconds later, defendant said, 'I don't know if you guys got any other suspects or what.' [The officer] explained they were talking to several people." The defendant told the officers he wanted to help them but did not want to incriminate himself. He asked for a lawyer several times but continued to talk to the officers. (*Id.* at pp. 1082, 1089.) On appeal, the defendant contended that the trial court erred by ruling he voluntarily initiated contact after stating that he wanted a lawyer. The California Supreme Court found the defendant had reinitiated a discussion about the investigation and impliedly waived the right he had previously invoked. (*Id.* at p. 1089.) Considering the totality of the circumstances, the Court ruled that the defendant had implied a new waiver that was knowing, intelligent and voluntary after he had requested counsel. (*Id.* at p. 1090.)

In *People v. Jackson* (2016) 1 Cal.5th 269 (*Jackson*), the defendant waived his *Miranda* rights and agreed to be interrogated. During the interrogation, the defendant stated, " ' Man just take me to jail man, I don't wanna talk no more.' " (*Id.* at p. 336.) The detectives stopped the interrogation and left the room. About five minutes later, a different detective came into the room and offered water to the defendant. The defendant told the officer he wanted to talk to someone to see what they were going to do with him. Defendant started to get agitated and stated he needed medication. Defendant agreed that he wanted to talk to the two detectives again. When the interrogating detectives

12

reentered the room, they asked the defendant if he wanted to talk to them again. He said, "yes sir" and proceeded to make the incriminating statement, "I know I did it." The trial court admitted the statement. (*Id.* at pp. 337-338.)

On appeal, the defendant argued his statements were obtained after he had invoked his *Miranda* right to remain silent. The *Jackson* court affirmed the denial of the suppression motion, finding the officers had "acceded to [the defendant's] desire to stop talking" and left the room. "It was only after [the defendant] asked to speak with the detectives again, and [one of the detectives] confirmed that this was his wish, that the detectives returned." The detectives then asked a simple question, " 'what's up?' " rather than a pointed question about the investigation. The defendant responded by making incriminating statements. (*Jackson*, *supra*, 1 Cal.5th at p. 340.) The *Jackson* court held there was no *Miranda* violation because the defendant had reinitiated the conversation with police about the investigation after an "innocuous" question. (*Ibid.*)

Here, as found by the trial court, defendant invoked his right to remain silent after clearly being advised of his *Miranda* rights. However, after the detectives left the room, acceding to his wishes to remain silent, they returned to begin the booking process. Defendant then volunteered that he did not want to go to jail and Sergeant Hartleben clarified that is why they were there. Defendant then volunteered that he "did it." Defendant reinitiated the conversation in response to a statement by Hartleben that he was going to be booked in jail. Like in *Jackson*, when defendant stated that he no longer wanted to talk, Sergeant Hartleben and Detective Salsberry left the room. They returned only to initiate the booking process and not to interrogate defendant. When defendant

13

was told that he was being booked for murder, he told them he did not want to go to jail. Hartleben then told him that "Its why we're here. We want to know what happened." Defendant then made the incriminating statements.

Substantial evidence establishes that defendant reinitiated the conversation with Sergeant Hartleben and Detective Salsberry. Defendant clearly stated that he did not want to go to jail and Hartleben responded that it was the reason they were at the station. Defendant then made the incriminating statements. Defendant had recently been advised of his rights to remain silent in both English and Spanish and was plainly aware of how to invoke those rights. Instead, he chose to speak with Hartleben and Salsberry. The trial court did not error by admitting defendant's statement.

C.      PREJUDICE

Even if the trial court erred by admitting defendant's statement, any error was harmless beyond a reasonable doubt. "The erroneous admission of statements obtained in violation of the Fifth Amendment is reviewed under the Chapman standard (*Chapman v. California* (1967) 386 U.S. 18, 24, []). [Citation.] That test requires the People 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] The standard is satisfied only if '[t]here is no reasonable possibility that the verdict would have been more favorable to defendant had [the] statements not been admitted.' [Citation.] Because confessions ' "[a]lmost invariably" will provide persuasive evidence of a defendant's guilt . . ., the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial under the traditional harmless-

14

error standard.' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1029; see also *People v. Case* (2018) 5 Cal.5th 1, 22.)

Here, although the prosecutor relied on defendant's statement in arguing that defendant should be found guilty of premeditated and deliberate first degree murder, it was not the only strong evidence against defendant. Defendant was seen severely beating Tejada until she was unconscious by two separate witnesses. Defendant dragged her to the front of the car and deliberately placed her head in front of the tire of the car. He then drove over her head. Defendant did not stop at this point. He returned and ran over her again. Defendant was still at the scene where the murder occurred when officers arrived, and there was no doubt he was the perpetrator.

Defendant complains that the only issue in the case was whether he committed first or second degree murder and that the prosecutor's argument focused on defendant's statement in arguing that the murder was premeditated and deliberate. During the prosecutor's opening argument, she stated there was undisputed evidence that defendant murdered Tejada from Whitaker, Bell, the 911 call and defendant's statement. When defendant ran over Tejada, he basically caused her insides to explode. All of the evidence was consistent, including the testimony regarding the autopsy and Sergeant Moordian testifying regarding the tire marks on Tejada. The prosecutor argued both his actions and words "speak to first-degree murder."

The prosecutor referred to defendant's statement, stating that defendant admitted that he hit Tejada and she had not hit him. The only time that defendant "chuckled" was when he spoke about violence. Further, the prosecutor argued that defendant murdered Tejada because she insulted him. He killed her to stop her from insulting him. The prosecutor argued that his intent to kill her was shown by his running over her with the car and the statements he made during the interview. She was still alive when he placed her head under the tire.

While the prosecutor referred to defendant's statement to show that defendant killed Tejada because defendant was upset with her and wanted to silence her, the jury could reasonably imply defendant's intent to kill by the manner in which defendant killed Tejada. This was a brutal murder, which took place over at least 20 minutes. Further, defendant had time to stop and think about his actions, in support of the jury's finding of premeditation and deliberation. Defendant dragged the unconscious Tejada to the front of the car so that he could run over her, not once, but twice. The severity of the beating and callousness with which defendant ran over Tejada was proof beyond a reasonable doubt that defendant committed premeditated and deliberate murder even without his statements. Any conceivable error was harmless.

**DISPOSITION**

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

J.

We concur:

RAMIREZ _____

P. J.

RAPHAEL _____

J.